901 P.2d 1285

Elaine DUNBAR, Plaintiff–Appellant,

v.

Apollo THOMPSON and Pentagram Corporation dba Burger King, Defendants–Appellees,

and

John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Doe Entities 1–10, and Doe Governmental Entities 1–10, Defendants.

No. 16135.

Intermediate Court of Appeals of Hawai'i.

Aug. 14, 1995.

Douglas R. Spencer and Daniel T. Pagliarini (Spencer & Richards, of counsel), on the brief, Honolulu, for plaintiff-appellant.

J. Thomas Weber, on the brief, Honolulu, for defendants-appellees.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

WATANABE, Judge.

Plaintiff–Appellant Elaine Dunbar (Plaintiff) brought this lawsuit to recover general, special, and punitive damages from Defendants–Appellees Apollo Thompson (Thompson) and Pentagram Corporation, dba Burger King (Pentagram), for physical injuries and emotional distress sustained when she was allegedly assaulted by Thompson during an early morning fight at a Burger King restaurant in Waikīkī on October 25, 1987. Pursuant to a jury verdict, the trial court entered a March 16, 1992 judgment in favor of Plaintiff and against Thompson for $3,850 but absolved Pentagram of any liability to Plaintiff. Plaintiff thereafter filed a motion for a new trial, which the trial court denied on April 27, 1992. This appeal followed.

Plaintiff contends that the trial court reversibly erred when it: (1) denied her motion for a new trial in the face of an inconsistent jury verdict, (2) precluded her expert witness from testifying at trial, and (3) refused to rule on and grant her motion for a continuance of trial.

We agree that the trial court erred when it denied Plaintiff's motion for a new trial. Accordingly, we vacate the judgment below and remand for a new trial. Our disposition of this appeal renders it unnecessary to address Plaintiff's remaining points of error.

## I. BACKGROUND

### A. The Incident

At approximately 4:00 a.m. on October 25, 1987, Plaintiff and her friend Edgar Juntilla (Juntilla) were eating an early morning snack at a Burger King restaurant located in the King's Village shopping complex in Waikīkī. They had just come from Spats, a Waikīkī discotheque, where Plaintiff reportedly consumed two to four alcoholic beverages. The two had planned to walk back to their apartment building after the snack.

The evidence at trial established that in 1987, during the hours between dark and dawn, the area in Waikīkī near the King's

Village shopping complex was considered by the Honolulu Police Department (HPD) to be a high crime area. During those hours, the area was frequented by "street people, prostitutes, pimps, people looking to make a fast buck, people taking property from others, in other words, grabbing an object and taking off with it." The area was also close to several nightclubs which served alcohol, and police officers were called upon frequently to deal with fights involving inebriated patrons.

There were no security guards on duty at the King's Village shopping complex between the hours of 2:00 a.m. and 6:00 a.m., and the Burger King restaurant was the only business establishment in the complex open twenty-four hours a day. However, except for enforcing a no-loitering policy, the Burger King staff did nothing to discourage vagrants, prostitutes, or drunks from patronizing the restaurant, and they relied on the HPD to keep the area safe.

Plaintiff testified that while she was eating and conversing with Juntilla on the morning in question, a loud commotion at another table attracted her attention. When she turned around to determine the source of the commotion, the noise stopped and several men who were seated at the other table looked at her. Plaintiff then turned to Juntilla and rolled her eyes.

Almost immediately, one of the men at the other table, Michael King (King), approached Plaintiff and began shouting obscenities at her. As racial slurs were exchanged and abusive verbal volleys between King and Plaintiff continued, Plaintiff claims that two of King's companions, including Thompson, walked over to Plaintiff's table. Noticing a "manager" in a Burger King uniform sitting with customers, Plaintiff yelled at him to either get the guys harassing her away from her table or to call the police. Plaintiff claims that the "manager," subsequently identified as Odest Wallace (Wallace), an off-duty assistant manager for the restaurant, privately talked to the men and told them to "knock it off." However, Wallace then said that "he 'can't be bothered with this' and he threw his hands up and he walked to the doors."

According to Plaintiff, after Wallace departed, an agitated King reached into his pocket, pulled out a wad of money, a "big bank roll of bills all rolled up," and shoved it into her face, shouting, "Look at this, bitch, this what you want? Is this what you want, you fucking white bitch?" Plaintiff claims that, in reflex, she "swung the wad and [King's] hand right back into [King's] face[.]"

Juntilla then stood up and, almost immediately, a fight broke out. During the scuffle, Juntilla fell to the floor and the other men piled onto him. Plaintiff alleges that when she attempted to pull one of the men away from Juntilla, that man turned around and attacked her, hitting and beating her over and over until she lost consciousness.

Thompson's version of the events that morning differed considerably. According to Thompson, he and King had begun the previous evening at Cilly's nightclub in Waikīkī, where Thompson had consumed about four "rum and cokes" and King had consumed at least five, and possibly ten, of "all sorts" of alcoholic drinks. From Cilly's, the two proceeded to the Burger King restaurant in the King's Village shopping complex because King conducted his "pimp" business there and picked up money from "his girls or women" who hung around that location.

Thompson testified that after entering the restaurant, he walked straight to the counter to order some food and King walked over to talk to Plaintiff, who was seated with a gentleman. While waiting for his food order, Thompson heard a heated argument going on between Plaintiff and King. He then saw King take a big roll of money from his pocket and shove it in Plaintiff's direction. Wondering what the commotion was all about, Thompson walked over to Plaintiff's table and, shortly thereafter, Wallace approached the table as well.

According to Thompson, he and King were requested by Wallace to "chill out ... cool down ... just keep it down." However,

"nobody was listening at that point because everybody was pretty heated up," and Wallace "more or less backed off," claiming that he was "not involved," "not in this," and went back to socializing with two customers who were prostitutes. Thompson testified that as tempers continued to flare, a scuffle suddenly broke out, and, before he knew it, people were on the floor rolling around and hands were flying. Thompson stated that the events happened so quickly that he was not sure if he actually hit Plaintiff, except maybe by accident. However, he subsequently pleaded guilty to third-degree assault charges stemming from the incident and received a thirty-day jail sentence.

Excelsa Tapat (Tapat), the Burger King assistant manager who was on duty at the time the scuffle broke out, and Wallace, who had worked the previous shift but had remained at the restaurant, also testified at trial.

According to Tapat, she was working at the food service counter when she observed King and Thompson enter the restaurant, purchase some food, and sit down in the restaurant dining room. Shortly thereafter, Plaintiff and a male companion entered the restaurant and proceeded to the food service counter, and Tapat went to her office to do some paperwork. While in the office, Tapat heard "a loud noise and a loud voice" and she returned to the counter to investigate what was happening. From that vantage point, Tapat saw Plaintiff and a man exchanging angry words; Tapat also witnessed Wallace walk up to the arguing couple, try to calm them down, separate them, and get them to leave the restaurant. However, Plaintiff slapped the man she was arguing with, a fight broke out, and Tapat immediately telephoned for police assistance.

Wallace testified that when he overheard vulgar words being shouted between Plaintiff and two males, he approached the group and asked them to "hold it down and to cease the argument because they were disturbing the rest of the customers." However, as he was standing there talking to them, "all of a sudden [Plaintiff] hit this one ... guy." A scuffle immediately broke out; whereupon Wallace instructed Tapat to call the police, then ran out to the street in search of a police officer.

### B. *Plaintiff's Injuries*

The evidence at trial was undisputed that Plaintiff sustained injuries as a result of the Burger King incident. Tapat testified that after the fight was over, she took a napkin and ice and went over to assist Plaintiff, who was lying on a chair, bleeding. An ambulance arrived shortly thereafter, and Plaintiff was taken to the Queen's Medical Center (Queen's).

Upon admission to Queen's, Plaintiff complained of headaches. She had a one-and-a-half-inch laceration for which she received five stitches, and she was x-rayed, treated, and released. Her x-rays, however, revealed no definite acute skull fracture. Additionally, the "visualized portions of Plaintiff's bony orbits [1] and paranasal sinuses [2] [were] intact and no soft tissue swelling of the scalp [could] be identified." Plaintiff's Exhibit 10 (footnotes added).

Two days after her release, Plaintiff returned to the emergency room at Queen's for a follow-up visit. At that time, she complained of dizziness, numbness in her hands, and that she was sleeping more than usual. She was given simple analgesics for her headaches and was instructed to follow up with her doctor or the Queen Emma Clinic within twenty-four to forty-eight hours to remove the stitches.

On October 31, 1987, when Plaintiff visited Dr. Haitham Dalgamouni (Dr. Dalgamouni),

---

1. "Orbit" refers to "the bony cavity perforated for the passage of nerves and blood vessels that occupies the lateral front of the skull immediately beneath the frontal bone on each side and encloses and protects the eye and its appendages—called also *eye socket." Webster's Third New International Dictionary* at 1586 (1981).

2. "Paranasal sinus" is "any of various sinuses ... in the bones of the face and head that are lined with mucous membrane derived from and continuous with the lining of the nasal cavity." *Id.* at 1638.

her personal physician, for follow-up and removal of the stitches, she again complained of headaches.

On January 25, 1988, Dr. Jordan Popper (Dr. Popper), a neurologist, conducted an evaluation of Plaintiff. Test results of Plaintiff's gait, stance, balance, strength and sensation, neck range of motion, and reflexes were normal. However, Plaintiff reported problems with headaches and pains in her body, weakness and numbness in her left arm, and difficulty with concentration, sleep, and nervousness. Dr. Popper testified that Plaintiff's symptoms stemmed from either post-traumatic/post-concussion syndrome or a neurotic/emotional cause, or a combination of the two. Dr. Popper saw Plaintiff again on March 7, 1988 and recommended further testing. However, Plaintiff refused the tests, claiming that she could not afford them. She also refused to use trial medications for treatment.

When Plaintiff saw Dr. Dalgamouni again for a routine gynecological exam on March 19, 1988, she did not report any headaches. When she saw him again over a year later on May 25, 1989, however, she complained about anxiety and sleeping problems, and Dr. Dalgamouni prescribed an anti-depressant.

On November 9, 1989, Plaintiff complained of headaches, neck pain, and lower back pain, and was treated with pain medication and ultrasound. She subsequently visited Dr. Dalgamouni on November 14, 1989, December 18, 1989, and January 3, 1990 with complaints of headaches and muscle spasms in both shoulders, which she claimed were related to her October 25, 1987 head injury. On May 8, 1990, Plaintiff complained of anxiety and depression, so Dr. Dalgamouni recommended psychiatric treatment.

On January 10, 1991, upon referral by her attorney, Plaintiff was examined by Dr. Kurt Mariano (Dr. Mariano), a chiropractor, regarding her complaints of headaches, pain in her neck, upper back, and left shoulder,

memory loss, and depression, all of which Plaintiff attributed to the assault and battery at the Burger King. Dr. Mariano diagnosed her as having post-traumatic chronic syndrome and treated her with physical therapy on January 11, February 8, and October 28, 1991. He also referred her for psychological treatment.

## II. *PROCEDURAL HISTORY*

On October 17, 1989, almost two years after the incident at the Burger King, Plaintiff filed this action against Pentagram for negligence and against Thompson for assault and battery. Plaintiff alleged in her complaint that Pentagram owed her a duty to keep its premises in a reasonably safe condition and to provide sufficient security so as to prevent incidents, such as her assault and battery by Thompson, from occurring. Plaintiff claimed that Pentagram's breach of this duty proximately caused her to suffer "grievous physical injuries and severe emotional distress."

In her Pretrial Statement filed on October 11, 1990, Plaintiff listed only two expert witnesses: Dr. Dalgamouni and Dr. Popper. On October 14, 1991, two months before trial was to commence on December 16, 1991, Plaintiff filed her Final Naming of Witnesses, listing for the first time Dr. Vincent Onorato (Dr. Onorato), a treating psychologist. However, Plaintiff was not actually examined by Dr. Onorato until a week later, on October 21, 1991.

On November 18, 1991, Pentagram filed a notice to take Dr. Onorato's deposition on December 3, 1991. Because said notice was filed two days after the discovery cutoff date set by Rule 12(r) of the Rules of the Circuit Courts of the State of Hawai'i [3] (RCCH), Plaintiff filed a motion for a protective order barring Dr. Onorato's deposition. A hearing on the motion was scheduled for Friday, December 13, 1991. In the meantime, Pentagram filed: (1) a motion to continue the

---

**3.** Rule 12(r) of the Rules of the Circuit Courts of the State of Hawai'i (RCCH) states in pertinent

part that "[d]iscovery shall be cut off 30 days before the assigned trial date."

discovery cutoff date; and (2) a motion in limine to preclude Dr. Onorato's testimony, or in the alternative, to continue trial date. Both of Pentagram's motions were also heard on December 13, 1991. Following the hearing, the motions court denied Plaintiff's motion for a protective order, granted Pentagram's motion to continue the discovery cutoff date, and ordered that Dr. Onorato's deposition be taken at 4:00 p.m. that afternoon. The trial court took no action on Pentagram's motion in limine.

At his deposition, Dr. Onorato opined that Plaintiff was suffering from: (1) a mild head injury, (2) organic personality syndrome, and (3) post-traumatic stress disorder. Dr. Onorato frankly admitted, however, that he had arrived at his diagnosis just the day before.

Because of Dr. Onorato's last-minute diagnosis, Pentagram filed a supplemental memorandum in support of its motion in limine, or in the alternative, to continue trial date, which the trial court heard prior to the commencement of trial on Monday, December 16, 1991. The trial court claimed that it did "not have the authority to continue the case" or "even the ability to do it, given that this is already the first day of trial[.]" However, the court granted Pentagram's motion in limine to bar Dr. Onorato's testimony at trial.

Following the trial, the jury returned a special verdict, awarding Plaintiff $7,000 in special damages and no general damages. The jury found that Thompson "intentionally or negligently legally cause[d] injury to [Plaintiff]," and that both Pentagram and Plaintiff were negligent. The jury also found that Pentagram's negligence was not a legal cause of Plaintiff's injury, but that Plaintiff's negligence was "the legal cause of injuries to herself[.]" The jury apportioned the percentage of fault for causing the incident as follows:

| | |
|---|---|
| Plaintiff | 45% |
| Thompson | 45% |
| Pentagram | 10% |

Based on the jury's special verdict, the trial court entered judgment against Thompson and in favor of Plaintiff for $3,850, which represents the total amount of special damages ($7,000), reduced by Plaintiff's percentage of fault for the incident. The court also entered judgment in favor of Pentagram against Plaintiff.

Plaintiff thereafter filed a motion for a new trial, alleging that the jury's special verdict responses as to Pentagram's liability and the amount of Plaintiff's damages were irreconcilably inconsistent. After this motion was denied, Plaintiff filed the instant appeal.

## III. DISCUSSION

■ "A conflict in the answers to questions in a special verdict does not automatically warrant a new trial; a new trial will be ordered only if the conflict is irreconcilable." *Kalilikane v. McCravey*, 69 Haw. 145, 152, 737 P.2d 862, 867 (1987); *Accord Myers v. South Seas Corp.*, 76 Hawai'i 161, 163, 871 P.2d 1231, 1233 (1994).

■ In determining whether an irreconcilable conflict exists between answers to special verdict questions, the answers "are to be construed in the context of the surrounding circumstances and in connection with the pleadings, instructions, and issues submitted." 9A C. Wright and A. Miller, *Federal Practice and Procedure: Civil 2d* § 2510, at 203 (1995). Additionally:

[T]he court must consider each of the answers claimed to be in conflict, disregarding the alleged conflicting answer but taking into consideration all of the rest of the verdict, and if, so considered, one of the answers would require a judgment in favor of the plaintiff and the other would require a judgment in favor of the defendant, then the answers are fatally in conflict. It is essential that the party seeking to set aside a verdict on the ground of conflict must be able to point out that one of the conflicting answers of the jury, in connection with the rest of the verdict except the issue with which it conflicts, necessarily requires the entry of a judgment different from that which the court has entered.

*Vieau v. City and County of Honolulu*, 3 Haw.App. 492, 499, 653 P.2d 1161, 1166 (1982) (quoting *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 206, 222 S.W.2d 985, 991 (1949)).

In this case, Plaintiff claims that there is an irreconcilable conflict in the jury's answers to the questions posed by the special verdict form in two respects. First, she contends that the jury's answers to questions 2, 3, and 7 on the special verdict form concerning Pentagram's liability are fatally inconsistent. Second, Plaintiff contends that the jury's failure to award her any general damages is inconsistent with its award of special damages and is also against the great weight of the evidence. We consider each of these contentions in turn.

### A. *Inconsistency as to Pentagram's Liability*

■ The relevant special verdict questions with respect to Pentagram's liability, and the jury's answers thereto, were as follows:

Question No. 2:

Was Pentagram Corporation dba Burger King negligent?

Yes ___×___        No _____

If your answer is "No", then proceed to Question No. 4. If your answer is "Yes", then proceed to Question No. 3.

Question No. 3:

Was Pentagram Corporation dba Burger King's negligence a legal cause of injury to Elaine Dunbar?

Yes _____        No ___×___

* * *

Question No. 7:

Taking the combined percentage of what caused the incident as 100 percent, what percentage of that fault is attributable each [sic] of the parties:

| | |
|---|---|
| Elaine Dunbar | 45% |
| Apollo Thompson | 45% |
| Burger King | 10% |
| | |
| Total | 100% |

Plaintiff contends that the jury's finding that Pentagram's negligence was not a legal cause of Plaintiff's injuries is irreconcilable with its apportionment to Pentagram of ten percent of the fault for causing the incident. Based on our review of the circumstances, pleadings, instructions, and issues involved in this case, and applying the *Vieau* test in this context, we agree.

■ We note initially that question 7 of the special verdict form was legally deficient. Although there is a great deal of disagreement among legal scholars as to whether apportionment for comparative negligence purposes is to be made by comparing fault or by comparing the extent to which negligence contributed to the plaintiff's injury,[4] *see, e.g.,* H. Woods, *Comparative Fault* § 5.5, at 124–26 (2d ed. 1987) (hereinafter *Woods*); 3 S. Speiser, C. Krause and A. Gans, *The American Law of Torts* § 13.22, at 755–56 (1986);

---

4. For example, Dean Prosser adamantly maintains that once it is determined that a party's negligence is "causal," or "contributed" to the plaintiff's injury, "apportionment must be made on the basis of comparative fault rather than comparative contribution." W. Prosser, *Comparative Negligence*, 51 Mich.L.Rev. 465 (1953). A number of courts have adopted the Prosser approach. *See, e.g., Kalland v. North Am. Van Lines,* 716 F.2d 570 (9th Cir.1983); *State v. Kaatz,* 572 P.2d 775 (Alaska 1977); *Amend v. Bell,* 89 Wash.2d 124, 570 P.2d 138 (1977).

On the other hand, Professor James supports the view that both fault and causal contribution should be considered in resolving the comparative negligence issue. F. James, *Connecticut's Comparative Negligence Statute: An Analysis of Some Problems,* 6 Conn.L.Rev. 207, 217 (1973–

74); H. Woods, *Comparative Fault* § 5.5, at 125 (2d ed. 1987). Courts adopting this approach have concluded that apportionment must be made on the basis of the parties' share in the responsibility for the damage, i.e., causative negligence. *See, e.g., Wing v. Morse,* 300 A.2d 491, 500–01 (Me.1973); *Kohler v. Dumke,* 13 Wis.2d 211, 215–16, 108 N.W.2d 581, 583–84 (1961). In *Wing,* for example, the Maine supreme court, relying on the interpretation by English courts of England's contributory negligence act, held that apportionment must be based on causative fault of the parties. "This means that fault not contributing to the damage cannot be taken into account. The only fault that can be considered is fault apart from which the damage would not have occurred." 300 A.2d at 500.

57B Am.Jur.2d *Negligence* § 1195, at 110–12 (1989), in Hawai'i, an actor's negligence can be a legal cause of harm to another only if such negligence is causative, i.e., a " 'substantial factor in bringing about the harm.' " *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 390, 742 P.2d 377, 386 (1987) (quoting *Restatement (Second) of Torts* § 431). It follows that in apportioning negligence under Hawai'i's comparative negligence statute,[5] the only negligence to be apportioned is causative negligence—negligence which contributed to the plaintiff's injury.

In this case, question 7 required the jury to apportion the extent to which the parties' fault contributed to the incident, rather than to Plaintiff's injuries. The question posed to the jury was thus improper.

Pentagram nevertheless maintains that under the *Vieau* test, the jury's special verdict answers are reconcilable. Pentagram points out that if the answer to question 7 is ignored, we would be left with a verdict that Pentagram was negligent, but that its negligence was not a legal cause of Plaintiff's injury. This would be consistent with the trial court's judgment in Pentagram's favor. If the answer to question 3 is ignored, we would have a verdict holding that Pentagram was negligent and that its negligence was ten percent responsible for causing the incident. However, since question 7 makes no reference to the legal cause of Plaintiff's injuries,

Pentagram contends that ignoring question 3 would not lead to a judgment different from that which the trial court entered in Pentagram's favor.

Our review of the record on appeal reveals, however, that there was no dispute at trial that Plaintiff sustained at least some injury as a result of the incident. Plaintiff clearly was knocked to the ground and was covered with blood after the incident. She also received a one-and-a-half-inch gash which required suturing. If Pentagram caused the incident which resulted in Plaintiff's injury, a judgment in Plaintiff's favor should have been entered. We are therefore unable to reconcile the jury's finding that Pentagram caused the incident with the jury's finding that Pentagram did not cause the injuries that undisputably resulted from the incident.

Under the foregoing circumstances, we conclude that the trial court abused its discretion when it harmonized the jury's answers to the special verdict questions and entered judgment for Pentagram.

### B. *Inconsistency as to Award of Damages*

The jury awarded Plaintiff a total of $7,000 in special damages and nothing for general damages. Plaintiff alleges that this verdict was inconsistent and against the great weight of evidence, and therefore, the trial court should have granted her request for a new trial. We agree.

---

**5.** HRS § 663–31 (1985) provides:

**Contributory negligence no bar; comparative negligence; findings of fact and special verdicts.** (a) Contributory negligence shall not bar recovery in any action by any person or the person's legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.

(b) In any action to which subsection (a) of this section applies, the court, in a nonjury trial, shall make findings of fact or, *in a jury trial, the jury shall return a special verdict which shall state:*

(1) The amount of the damages which would have been recoverable if there had been no contributory negligence; and
(2) *The degree of negligence of each party, expressed as a percentage.*
(c) Upon the making of the findings of fact or the return of a special verdict, as is contemplated by subsection (b) above, the court shall reduce the amount of the award in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made; provided that if the said proportion is greater than the negligence of the person or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought, the court will enter a judgment for the defendant.

(d) The court shall instruct the jury regarding the law of comparative negligence where appropriate.
(Emphases added.)

■ A personal injury plaintiff is generally entitled to recover damages for all the natural and proximate consequences of the defendant's wrongful act or omission. Annotation, *Validity of Verdict Awarding Medical Expenses to Personal Injury Plaintiff, But Failing to Award Damages for Pain and Suffering, Compensable Pain and Suffering,* 55 A.L.R.4th 186 (hereinafter Annot., *Validity of Verdict,* 55 A.L.R.4th), § 2[a] at 191 (1987). The damages recoverable fall into two categories.

■ *General damages* "encompass all the damages which naturally and necessarily result from a legal wrong done. Such damages follow by implication of law upon proof of a wrong," *Ellis v. Crockett,* 51 Haw. 45, 50, 451 P.2d 814, 819 (1969) (citation omitted), and include such items as physical or mental pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms. 22 Am.Jur.2d *Damages* § 41 at 65 (1988). *Special damages* are the "natural but not the necessary result of an alleged wrong and . . . depend on the circumstances peculiar to the infliction of each particular injury." *Ellis,* 51 Haw. at 50, 451 P.2d at 819 (citations omitted). Special damages are often considered to be synonymous with pecuniary loss and include such items as medical and hospital expenses, loss of earnings, and diminished capacity to work. 22 Am.Jur.2d *Damages* § 41 at 65.

Where a defendant's liability to a personal injury plaintiff is established, a jury verdict which awards the plaintiff special damages but no general damages for pain and suffering is generally regarded as improper. Annot., *Validity of Verdict,* 55 A.L.R.4th § 2[a] at 191–92; 1 M. Minzer, J. Nates, C. Kimball, D. Axelrod and R. Goldstein, *Damages in Tort Actions* (hereinafter *Damages in Tort*

*Actions* ) §§ 4.64[1] and 4.64[3] at 4–238—4–239, 4–253 (1955); 22 Am.Jur.2d *Damages* § 42 at 65. In invalidating such verdicts, courts commonly reason that the zero-general-damages award is one of the following: (1) inconsistent with the special damages award; (2) in disregard of the proper instructions of the trial court; (3) against the great weight of the evidence; or (4) the result of an improper compromise by jurors unconvinced of liability but willing to compromise their positions in return for a limitation of damages to actual out-of-pocket losses. 1 *Damages in Tort Actions* § 4.64[2] at 4–241—4–253; Annot., *Validity of Verdict,* 55 A.L.R.4th at 191–92; 22 Am.Jur.2d *Damages* § 42 at 65.

■ In this case, Plaintiff claimed entitlement to special damages of $4,368.26 for medical expenses and $60,422 for loss of income. Although Plaintiff's claim for medical expenses was supported by invoices, her claim for loss of income was very speculative.[6] It is therefore unclear what the jury's award of $7,000 for special damages was meant to encompass. However, if the $7,000 figure included an award for Plaintiff's medical expenses, it was inconsistent for the jury not to award Plaintiff even a small amount for pain and suffering, since both special damages for medical expenses and general damages for pain and suffering are largely dependent on the same proof.

■ Moreover, the evidence adduced at trial was uncontroverted that Plaintiff was knocked to the floor during the scuffle at the Burger King restaurant and sustained a gash to her head which resulted in profuse bleeding and required stitches. Plaintiff clearly experienced some pain and suffering, and the jury's verdict awarding Plaintiff zero general damages for pain and suffering was against the great weight of the evidence.

---

**6.** Plaintiff testified that at the time of the Burger King incident, she was a partner in a business called Pareau Pacifica, which was established about 1984 and designed, manufactured, and distributed silk-screened pareaus (traditional Polynesian wraps) and tee shirts. Plaintiff claimed that the business was beginning to prosper, as evidenced by the increase in the company's gross income of $11,268.77 in 1984 to about $22,000 in 1985 and $39,842 in 1986. Plaintiff did not, however, support her claim with records of company receipts and expenses and did not offer any evidence as to what the company's profits were for those years. Plaintiff claims that after the Burger King incident, she could no longer perform her duties and keep up with the production pace. Accordingly, the company's income dropped and the partnership dissolved.

Additionally, the trial judge specifically instructed the jurors that if they found for Plaintiff "on the issue of liability, [Plaintiff] is entitled to damages in such amount as in [their] judgment will fairly and adequately compensate her for the injuries which she suffered." The judge also instructed the jurors that, in arriving at the amount of such damages, they should consider "[t]he pain and suffering, disability, and mental anguish which she endured and is reasonably probable to suffer in the future because of the injury[.]" The jury thus disregarded the judge's instructions when, despite its determination of Thompson's liability, it failed to award Plaintiff at least some general damages.

We recognize that in certain exceptional circumstances, courts will uphold a zero general damages award in the face of an award of special damages. For example, if the evidence indicates a dispute over the amount of claimed special damages, many courts interpret the zero-general-damages verdict as evidence of the jury's intent to include in the special damages award an amount for pain and suffering. This exception to the general rule is often applied where the amount of special damages claimed by the plaintiff appears to be unreasonable or inflated, or where the evidence indicates that not all of the claimed special damages were actually attributable to the defendant's act, as, for example, where the plaintiff had a pre-existing impairment of health or was comparatively negligent. 1 *Damages in Tort Actions* § 4.64[3][a] and [b], at 4–253—4–258; Annot. *Validity of Verdict*, 55 A.L.R.4th § 4[a], at 208–12.

Additionally, zero verdicts for general damages are generally allowed to stand despite an award to the plaintiff of special damages where, based on the evidence, the jury could reasonably have concluded that the plaintiff suffered no compensable pain and suffering or general damages. This result is likely in one of two circumstances: (1) where there is no probative evidence that the plaintiff incurred pain and suffering as a consequence of the defendant's act; and (2) where the only evidence of pain and suffering is the plaintiff's subjective testimony, which the jury could reasonably have concluded was exaggerated or lacking in credibility. *Damages in Tort Actions* § 4.64[3][c], at 4–258—4–260; Annot., *Validity of Verdict*, 55 A.L.R.4th § 5, at 213, 220.

In this case, there was considerable dispute at trial as to the reasonableness of Plaintiff's total claim for special and general damages. However, it was uncontroverted that Plaintiff did incur injury and medical expenses and did experience some pain and suffering as a result of the incident. Furthermore, in comparative negligence cases, HRS § 663–31 specifically requires that the jury return a special verdict which shall state "[t]he amount of the damages which would have been recoverable if there had been no contributory negligence," and "[t]he degree of negligence of each party, expressed as a percentage." Since the foregoing statute precludes a jury from reducing a plaintiff's recovery based on its belief that the plaintiff was contributorily negligent, and the jury was so instructed by the judge, we are not inclined to interpret the special verdict award of special damages in this case as including an award for pain and suffering. The exceptions to the general rule are thus not applicable in this case, and we are unable to reconcile the jury's special verdict.

## IV. CONCLUSION

The trial court erred when it denied Plaintiff's motion for a new trial because (1) the jury's answers to the questions posed by the special verdict form regarding Pentagram's liability were inconsistent, and (2) the jury's award to Plaintiff of special damages but no general damages was improper.

Accordingly, we vacate the judgment of the trial court and remand for a new trial.

On remand, we strongly recommend that the trial court, as a preface to the questions on the special verdict form and also in the court's instructions, specifically inform the jury about the answers or findings which will

render unnecessary an answer to the comparative negligence question.