**CHILDREN'S HOSPITAL AND HEALTH CENTER, a Washington corporation; Plaintiff–Appellee,**

v.

**S. Kimberly BELSHE, Director, California Department of Health Services, Defendant–Appellant.**

**No. 98–15559.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 15, 1999.

Filed Aug. 16, 1999.

Asher Rubin, Deputy Attorney General, San Francisco, California, for the defendant-appellant.

Michael S. Sorgen, San Francisco, California, Dean L. Johnson, Dean L. Johnson, P.C., San Francisco, California, for the plaintiff-appellee.

Before: SNEED, THOMPSON and FLETCHER, Circuit Judges.

Opinion by Judge DAVID R. THOMPSON; Dissent by Judge SNEED.

DAVID R. THOMPSON, Circuit Judge:

## OVERVIEW

Eighteen hospitals located outside of California ("the plaintiffs") brought suit against S. Kimberly Belshe ("Belshe"), Director of the California Department of Health Services ("CDHS"). The plaintiffs alleged that CDHS's method for reimbursing out-of-state hospitals that treat California's Medicaid ("Medi–Cal") patients violates the portion of the Social Security Act known as the Boren Amendment, 42 U.S.C.A. § 1396a(a)(13)(A) (West 1992). Belshe moved for summary judgment.

In its first summary judgment order, the district court held the Boren Amendment applies to out-of-state hospitals. Thereafter, in a second order, the district court held the CDHS was failing to meet the Boren Amendment's requirements in setting reimbursement rates for out-of-state hospitals that treat Medi–Cal patients. The court also held the CDHS is obligated to make additional payments to out-of-state hospitals treating Medi–Cal patients that serve a disproportionate share of low-income individuals ("DSH payments"). The district court then certified its summary judgment orders for immediate appeal pursuant to 28 U.S.C. § 1292(b), and this appeal followed.

In this appeal, Belshe argues the plaintiffs' lawsuit is moot because the Boren Amendment was repealed during the pendency of the action, and in any event, the lawsuit is barred by the Eleventh Amendment. Alternatively, Belshe contends that the district court erred in holding that the Boren Amendment applies to out-of-state hospitals. We have jurisdiction under 28 U.S.C. § 1292(b), and we affirm.

## BACKGROUND

■ Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. ("the Medicaid Act"), authorizes the payment of federal funds to states to defray expenses incurred in providing medical assistance to low-income individuals. *See* 42 U.S.C. § 1396; *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Unlike Medicare, which is administered nationally, the Medicaid Act is administered by the individual states that choose to participate in the program. If a state participates in the program, the state must comply with the requirements of the Medicaid Act and its implementing regulations. *See* 42 U.S.C. § 1396a; 42 C.F.R. §§ 430 et seq.; *Wilder*, 496 U.S. at 502, 110 S.Ct. 2510. All fifty states have chosen to participate.

States wishing to receive Medicaid funds must submit a state medical assistance plan to the Secretary of Health and Human Services ("Secretary"). This plan must detail the state's coverage and include the methodology it will use to reimburse institutional health care providers for the services they render to Medicaid recipients. *See* 42 U.S.C. § 1396a(a); 42 C.F.R. §§ 430.10—430.18; *Wilder*, 496 U.S. at 502, 110 S.Ct. 2510. The plan must be approved by the Health Care Financing Administration ("HCFA"), the federal agency responsible for administering the Medicaid program. *See* 42 C.F.R. §§ 430.10, 430.12.

Prior to 1980, states were required to reimburse hospitals the "reasonable cost" of providing inpatient services, generally in the form of retrospective payments based on a hospital's actual costs for given services. *See* 42 U.S.C. § 1396a(a)(13) (1976); *Folden v. Washington State Dep't of Social and Health Serv.*, 981 F.2d 1054, 1056 (9th Cir.1992). Hoping to contain escalating medical costs, Congress enacted a new standard for hospital reimbursement as part of the 1981 Omnibus Reconciliation Act, Pub.L. No. 97–35 § 2173. This new standard, known as the Boren Amendment, required a state plan to

provide ... for payment ... of the hospital services ... provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ... and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ... ) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each hospital ... and periodic audits by the State of such reports....

42 U.S.C.A. § 1396a(a)(13)(A) (West 1992).

■ The purpose of the Boren Amendment was "to give states greater flexibility in calculating reasonable costs and in containing the continuing escalation of those costs." *Folden*, 981 F.2d at 1056. The Third Circuit in *West Virginia University Hospitals, Inc. v. Casey*, 885 F.2d 11 (3d Cir.1989), *aff'd on other grounds*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), concluded that the Boren Amendment "authorizes states to develop their own medicaid reimbursement standards and method-

ologies for payment of hospital services, but subjects those standards and methodologies to three general federal requirements." *Id.* at 22. First, states must take into account hospitals serving a disproportionate share of low-income patients. *Id.* at 22–23. Second, states must make findings that the rates are "reasonable and adequate" to meet the necessary costs of an efficiently operated hospital. *Id.* And third, states must assure Medicaid patients reasonable access to inpatient hospital care. *Id.* As the Third Circuit noted in *West Virginia University Hospitals,* these requirements are set forth in 42 C.F.R. §§ 447.250–447.280. *Id.*

The plaintiffs in this case, eighteen hospitals outside of California that provided services to Medi–Cal patients, filed suit on March 28, 1995 for declaratory and injunctive relief. They allege that Belshe, the Director of the CDHS, is violating the Boren Amendment by failing to make the Amendment's required findings for payments to out-of-state hospitals and by failing to make DSH payments to out-of-state hospitals serving a disproportionate share of low-income individuals.[1] Belshe moved for summary judgment, arguing that the Boren Amendment does not apply to out-of-state hospitals. On January 9, 1997, the district court denied the motion, holding that the Amendment applies to out-of-state hospitals.

Soon after the district court issued its January 9, 1997 order, Congress amended the Medicaid Act to "eliminate the Boren Amendment and establish instead a notice and comment provision." *Exeter Memorial Hosp. Ass'n v. Belshe,* 145 F.3d 1106, 1108 (9th Cir.1998) (citing Balanced Budget Act of 1997, Pub.L. No. 105–33, 111 Stat. 251, § 4711, codified at 42 U.S.C. § 1396a(a)(13)(A)). The new section became effective with respect to payments for services commencing October 1, 1997. *See id.* The new section continues to require that states take into account hospitals that serve a disproportionate number of low-income patients, but repeals the "findings" and "assurances" methodology enumerated in the Boren Amendment. Instead, the new section requires a "public process" for determining rates.[2]

After the Boren Amendment was repealed, the district court held in a second order on February 4, 1998, that the CDHS's method for reimbursing out-of-state hospitals did not satisfy the findings required by the Boren Amendment. In essence, the district court held that until the CDHS developed new rates for payment pursuant to the "public process" provisions of the Balanced Budget Act of 1997, the CDHS had to comply with the Boren Amendment. The court also held that the Amendment required the CDHS

1. The CDHS uses Boren Amendment standards in determining the methodology for reimbursing in-state hospitals, ninety percent of which are paid for inpatient services at a negotiated contract rate and some of which receive additional payments ("DSH payments") for serving a disproportionate share of low-income patients. By contrast, Belshe admits that the CDHS pays out-of-state hospitals "at the average of the contract rates paid to California hospitals" and does not make any DSH payments to out-of-state hospitals.

2. The new section of the statute requires that a state plan for medical assistance

(13) provide—
(A) for a public process for determination of rates of payment under the plan for hospital services ... under which—
(i) proposed rates, the methodologies underlying the establishment of such rates,

and justifications for the proposed are published,
(ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,
(iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and
(iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1923) the situation of hospitals which serve a disproportionate number of low-income patients with special needs;
. . . .
42 U.S.C.A. § 1396a(a)(13)(A) (West Supp. 1998).

to make DSH payments to out-of-state hospitals. Concluding that its determinations about the applicability of the Boren Amendment to out-of-state hospitals involved a "controlling question of law as to which there may be substantial ground for difference of opinion," the district court certified the question for interlocutory appeal, which appeal this court authorized pursuant to 28 U.S.C. § 1292(b). The district court then stayed the action pending our decision in this appeal.

## DISCUSSION

### A. Mootness and Eleventh Amendment Immunity

■ Belshe contends this appeal should be dismissed and the district court's orders vacated because the repeal of the Boren Amendment renders any prospective relief moot. We disagree. A live controversy exists in this case, *see Cook Inlet Treaty Tribes v. Shalala,* 166 F.3d 986, 989 (9th Cir.1999), and we can grant effective relief. *Cf. Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996) (an appeal should be dismissed as moot "when, by virtue of an intervening event, a court of appeals cannot grant 'any effectual relief whatever' . . . ." (citation omitted)).

After the Boren Amendment was repealed, HCFA advised its regional offices and the states participating in the Medicaid program that compliance with the new public process requirements of 42 U.S.C.A. § 1396a(a)(13)(A) (West Supp.1998) (the section that replaced the Boren Amendment) would be waived for payment methodologies that had been validly determined under the Boren Amendment. *See* December 10, 1997 Letter from HCFA to State Medicaid Director ("In other words, states are not required to subject their existing rates to a public process to the extent that those existing rates were validly determined in accordance with legal standards in effect prior to October 1, 1997."). This letter from HCFA autho-

rized states to continue to use payment methodologies approved under the Boren Amendment standard notwithstanding its repeal. Pursuant to this letter authority, CDHS continues to administer its Medi–Cal program by using the Boren Amendment payment methodology. It refuses, however, to apply that methodology to its reimbursement of out-of-state hospitals for services they provide to Medi–Cal patients. The plaintiffs ask us to declare this exclusionary practice unlawful and to enjoin the CDHS from continuing it.

Because a live controversy exists and we can grant effective relief, we conclude this action is not mooted by the repeal of the Boren Amendment. *Cf. Exeter Memorial Hosp. Ass'n v. Belshe,* 145 F.3d 1106, 1108–09 (9th Cir.1998) (noting the repeal of the Boren Amendment after the district court's decision, yet holding, without expressing concerns about mootness, that the CDHS violated the Boren Amendment when it implemented changes to its Medicaid plan without first obtaining federal approval).

■ Nor is the plaintiffs' suit foreclosed by the Eleventh Amendment. Although the Eleventh Amendment precludes any action against state officers to recover past due payments, it does not preclude a suit against state officers for prospective relief from an ongoing violation of federal law. See *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 288, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (O'Connor, J., concurring); *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Here, the CDHS continues to administer its Medicaid program pursuant to the Boren Amendment, but denies reimbursement to out-of-state hospitals that provide services to Medi–Cal patients. In pursuing this course of action, the CDHS is committing an ongoing violation of federal law *if* the Boren Amendment applies to out-of-state hospitals.[3]

---

3. *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), on which the CDHS relies, is inapposite. There, the state

brought its policy into compliance with a newly enacted federal law while the case was

## B. Application of the Boren Amendment to Out-of-State Hospitals

■ For services rendered to Medi–Cal patients, California reimburses its in-state hospitals differently from the way it reimburses out-of-state hospitals. Belshe argues the Boren Amendment permits this because Congress intended to limit payments under Boren to in-state hospitals, and applying Boren's requirements to out-of-state hospitals would impose a large, unintended administrative burden on the states. We reject Belshe's legislative intent argument because it runs counter to the plain meaning of the Boren Amendment and the statute's legislative history. We reject Belshe's administrative burden argument because we find it unpersuasive.

### 1. Legislative Intent
#### a. Plain Meaning

■ Statutory interpretation begins with the language of the statute. *See United States v. Ron Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). When the plain meaning of a statutory provision is unambiguous, that meaning is controlling. *Id.* at 242, 109 S.Ct. 1026. To determine the plain meaning of a statutory provision, we examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy. *See Green v. Commissioner,* 707 F.2d 404, 405 (9th Cir.1983). If ambiguity exists, we may use legislative history as an aid to interpretation. *See id.; Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441, 1453 (9th Cir.1992).

In setting forth the reimbursement requirements, the text of the Boren Amendment refers to "hospital services," without limiting such services to those provided by in-state hospitals. 42 U.S.C.A. § 1396a(a)(13)(A) (West 1992). Belshe argues that Congress's failure to refer to

out-of-state hospitals in the Amendment points to Congress's intent to exclude them. We disagree. In fact, it is the converse of this argument that is persuasive. Because the statute does not distinguish between in-state and out-of-state hospitals, the plain meaning of the statute is that Congress did not intend to differentiate between the two.

This interpretation is buttressed by the fact that elsewhere in the Medicaid statute (though not in the Boren Amendment) Congress creates distinctions for in-state institutions. For example, when a state plan includes medical assistance for services in an intermediate care facility for the mentally retarded, Congress requires periodic on-site inspections of each such facility "within the state." 42 U.S.C.A. § 1396(a)(31)(B) (West 1992).

Belshe refers to the definitions section of the Medicaid statute, 42 U.S.C. § 1396r–4(b)(1)(A), which sets forth the requirements for a hospital to be eligible for DSH payments. That section defines hospitals eligible for DSH payments by comparing them to the mean of "hospitals receiving medicaid payments in the State." Belshe argues this language proves that the DSH payment requirement in the Boren Amendment applies only to in-state hospitals. This argument fails.

Section 1396r–4(b)(1)(A) provides that states administering their Medicaid programs are required to determine whether a hospital qualifies for DSH payments by referring to the mean number of Medicaid patients served by hospitals in their state. This language does not say that only hospitals within the state can qualify for DSH payments; instead, it uses in-state hospitals to calculate a benchmark for the number of Medicaid patients served to determine whether a hospital (in-state or out-of-

pending in the district court. *Id.* at 66, 106 S.Ct. 423. Here, although the Boren Amendment was repealed while this case was pending in the district court, the CDHS continues to operate under the Amendment and has not changed its policy of denying reimbursement

to out-of-state hospitals that provide services to Medi–Cal patients; nor has it developed new rates for payment pursuant to the "public process" provisions of the Balanced Budget Act of 1997.

state) qualifies for DSH payments. Hospitals serving a number of Medicaid patients "at least one standard deviation above the mean" qualify for DSH payments. 42 U.S.C. § 1396r–4(b)(1)(A). Thus, for example, a hospital in Arizona serving a number of Medicaid patients one standard deviation above the mean of hospitals serving Medicaid patients in California would meet this criterion for qualification, and could therefore seek DSH payments from California for treating Medi–Cal patients. Or, alternately, an Arizona hospital qualifying for DSH payments under the Arizona Medicaid program because of comparison with the mean of Arizona hospitals would similarly meet this criterion.

No court, other than the district court in this case, has directly interpreted the language of the Boren Amendment with regard to its applicability to out-of-state hospitals. Two courts have concluded by implication, however, that the Boren Amendment applies to out-of-state hospitals. In *West Virginia University Hospitals, supra,* 885 F.2d at 29, the Third Circuit concluded that Pennsylvania's reimbursement rate for a nearby West Virginia hospital that served many Pennsylvania Medicaid patients violated the requirements of the Boren Amendment. The court scrutinized the statutory language for its relevance to out-of-state hospitals:

> Nothing in section 1396a(a) speaks in terms of a dichotomy in rate reimbursement built on state boundary lines; it nowhere suggests that state boundary lines act as points of demarcation in reimbursement for the delivery of healthcare. Under the federal regulations ... state boundary lines, except for administrative responsibility, bear an insignificant role, if any, with respect to the actual delivery of health care in a program designed on a national level to aid the poor in a highly mobile society.

*Id.*

In addition, a district court in this circuit has concluded by implication that the Boren Amendment applies to out-of-state hospitals. *See Multicare Medical Center v. Washington,* 768 F.Supp. 1349, 1401 (W.D.Wash.1991) (holding that Washington must make DSH payments to out-of-state border hospitals that serve Washington's Medicaid recipients). These court decisions, while not directly on point, lend support to our conclusion that the Boren Amendment unambiguously applies to out-of-state hospitals.

#### b. Legislative History

Because the Boren Amendment is unambiguous, we need not examine its legislative history. *See Green,* 707 F.2d at 405. Nevertheless, given the importance of the issue and the present view of the Secretary and HCFA, we shall examine the statute's legislative history. *See id.* at 407.

Congress passed the Boren Amendment "to give states greater flexibility in calculating reasonable costs and in containing the continuing escalation of those costs." *Folden,* 981 F.2d at 1056. The Senate Report comments that, under the Boren Amendment, "[s]tates would be free to establish rates on a statewide or other geographic basis, without reference to medicare principles of reimbursement." S.Rep. No. 97–139, 97th Cong., 1st Sess. 478, *reprinted in* 1981 U.S. Code Cong. & Admin. News 744. As the district court correctly observed, this statement suggests that Congress was not assuming rates would be set under the Boren Amendment according to state boundaries.

The Senate Report also states that "[t]he flexibility given the States is not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care." *Id.* This statement demonstrates Congress's underlying concern for maintaining quality health care, a goal which would be compromised if states could reduce their rates arbitrarily. Congress was also attentive to the broad purpose of the entire Medicaid program, which was to provide health care to low-income individuals. *See West Virginia Univ. Hosp.,* 885 F.2d at 23 (explaining

that the states' discretion was limited by Congress's desire to ensure that Medicaid recipients have access to services and that disproportionate share hospitals are not discouraged from providing care to Medicaid patients due to inadequate financial support).

As the district court wisely concluded, "[i]nasmuch as the Boren Amendment was a sophisticated attempt to fulfill [the goal of quality care] while at the same time encouraging efficiency, it makes little sense to remove out-of-state hospitals from that worthy rubric."

■ Belshe asks us to defer to HCFA's current interpretation of the Boren Amendment, which interpretation it propounded in an *amicus curiae* brief filed in the district court. In that brief, HCFA took the position that the Boren Amendment does not apply to out-of-state hospitals. We reject Belshe's request. We may not defer to HCFA's interpretation where Congress has unambiguously addressed the issue. *See Chevron, U.S.A., Inc. v. N.R.D.C., Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### 2. Administrative Burden

Belshe also argues that applying the Boren Amendment to out-of-state-hospitals would impose too high an administrative burden on the states. This argument relates to Congress's intent in enacting, and then repealing, the Boren Amendment. Belshe contends that the repeal of the Boren Amendment and its replacement with a simpler public notice and comment requirement is evidence that Congress thought applying the Boren Amendment to out-of-state hospitals was too burdensome on the states. We reject this argument. Belshe fails to identify any statements by Congress raising the concerns she cites. Moreover, common sense dictates that, if Congress were concerned about the administrative burden imposed on the states by applying the Boren Amendment to out-of-state providers, instead of repealing the Amendment, it would simply have added the words "in-state" to the "hospital ser-

vices" language of the Amendment. Congress's actions, therefore, do not imply that the Amendment's repeal was prompted by a concern for the burden of complying with the Amendment's provisions for payments to out-of-state hospitals.

Nevertheless, Belshe argues Congress must have meant to exclude out-of-state hospitals from the Amendment because it would be impossible for a state to anticipate, and establish reimbursement rates for, all out-of-state hospitals where its Medicaid patients might receive care. Compounding the difficulty, Belshe argues, would be the necessity of determining whether the operational costs incurred by out-of-state facilities meet the "efficiently and economically operated facility" standard of the Boren Amendment.

■ The weakness in Belshe's argument is that she presumes the Boren Amendment requires states to apply the same methodology and administrative requirements to out-of-state hospitals that states apply to in-state hospitals. This is not so. As the Third Circuit noted in *West Virginia University Hospitals,* "[w]e neither hold nor suggest that Pennsylvania must apply precisely the same methodology to ... out-of-state hospitals as it does for its in-state hospitals if there is a rational basis for departure." 885 F.2d at 29. The key is that "[t]he methodology applied ... be rational, not arbitrary or whimsical." *Id.*

In the case of out-of-state hospitals providing only occasional emergency care, a state could develop a reasonable methodology for reimbursement different from its in-state provider methodology. Indeed, as the district court observed, some of the impracticalities Belshe cites would not necessarily apply to out-of-state hospitals. For example, many of the regulations Belshe cites as being too difficult to apply, such as uniform cost reporting and period audits, apply only to "participating providers," which are hospitals enrolled in a state's Medicaid program. *See* 42 C.F.R. § 447.253(g). An out-of-state hospital

might not be enrolled in such a program, although it could be. As the district court noted in reviewing the State of Georgia's administration of its Medicaid program, some out-of-state hospitals are enrolled in Georgia's Medicaid program and Georgia reimburses these hospitals at the same rates it uses to reimburse in-state, enrolled hospitals. With regard to non-enrolled out-of-state hospitals, however, Georgia reimburses them at rates consistent with the other state's rates under the Medicaid program or at a specified percentage of allowable costs.

In sum, although the Boren Amendment has extensive reimbursement requirements, a factor that may well explain why Congress chose in 1997 to repeal it, the Amendment nonetheless permits states some flexibility in developing their reimbursement methodologies. We conclude, as did the Third Circuit in *West Virginia University Hospitals,* that a state need not use the same rate-setting scheme for non-participating out-of-state hospitals as it does for in-state hospitals. Although the administrative burden on states in reimbursing out-of-state providers under the Boren Amendment may still be significant, this burden does not provide evidence that Congress did not intend to apply the Amendment's requirements to out-of-state hospitals.

## CONCLUSION

Even though Congress repealed the Boren Amendment during the pendency of this action, the case is neither moot nor barred by the Eleventh Amendment. The CDHS has the option of complying with the Boren Amendment or with the public process provisions of the Balanced Budget Amendment of 1997. It does not have the option of failing to comply with either law. So long as it fails to comply with the Balanced Budget Amendment, it is bound by the Boren Amendment, and we hold that the Boren Amendment applies to all hospitals, including out-of-state hospitals. We reject Belshe's contention that the administrative burden of applying the Amendment to out-of-state providers suggests that Congress intended otherwise.

AFFIRMED.

SNEED, Circuit Judge, dissenting:

I respectfully dissent.

In this case, we are asked to decide whether the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A) (1997), applies to out-of-State providers, including appellees Children's Hospital and Medical Center, et al. ("appellees"). I conclude that it does not.

Although I agree with the majority that appellees present a live controversy in this case that we can properly review, I disagree with the majority's statutory analysis of the Boren Amendment and its decision to disregard HCFA's interpretation of it. The majority improperly concludes that the Boren Amendment is unambiguous. In so doing, it ignores the reasonable interpretation of a statute proposed by the administrative agency charged by Congress to implement it. This, of course, ignores the teaching of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

The Boren Amendment is ambiguous and HCFA's interpretation of the statute is permissible. Therefore, I would reverse the decision of the district court.

I.

This case involves a complex administrative and statutory scheme. Consequently, an overview of the process by which states reimburse providers of medical services rendered to people who qualify for Medicaid assistance is necessary.

Medicaid is a joint federal-state program that provides "federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2677–78, 65 L.Ed.2d 784 (1980). Although the federal government provides guidelines that the partici-

pating states must follow before they are eligible for reimbursement, each of those states enjoys great flexibility in carrying out the Medicaid program. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513–14, 110 L.Ed.2d 455 (1990), *rev'd Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). A participating state must, for example, provide the federal government with a plan to provide medical assistance to qualified individuals and a methodology to reimburse providers of such services. *See* 42 U.S.C. § 1396a (1997). The state, however, is free to develop its program in the way it sees fit; in other words, it must only follow general federal guidelines. One such guideline-the Boren Amendment-is the subject of this appeal.

Congress enacted 42 U.S.C. § 1396a(a)(13)(A), commonly known as the Boren Amendment, in 1980. *See Folden v. Washington State Dep't of Social and Health Serv.,* 981 F.2d 1054, 1056 (9th Cir.1992). The Boren Amendment provided, in pertinent part, that a state plan for medical assistance must:

> provide ... for payment ... of the *hospital services* ... provided under the plan through the use of rates (determined in accordance with the methods and standards developed by the State ... and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ... ) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secre-

tary, for the filing of uniform cost reports by each hospital ... and periodic audits by the State of such reports....

42 U.S.C. § 1396a(a)(13)(A) (emphasis added).

The majority quite correctly points out that Congress' purpose in enacting the Boren Amendment was "to give states greater flexibility in calculating reasonable costs and in containing the continuing escalation of those costs." Maj. Op. at 1093 (quoting *Folden,* 981 F.2d at 1056). Prior to its enactment, the Boren Amendment required the states to submit more detailed schemes describing methods for reimbursement which the federal government had to approve as "reasonable." *See Folden,* 981 F.2d at 1056 (citing 42 U.S.C. § 1396a(a)(13)(E) (1976)). In an attempt to provide participating states with greater flexibility, the Boren Amendment "authorize[d] states to develop their own medicaid reimbursement standards and methodologies for payment of hospital services." *West Virginia Univ. Hosp., Inc. v. Casey,* 885 F.2d 11, 22 (3rd Cir.1989), *aff'd on other grounds* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). Under the Code of Federal Regulations, these standards and methodologies only needed to follow three general guidelines: (1) to specially consider those hospitals serving a disproportionate share of low income individuals, 42 C.F.R. § 447.298; (2) to make findings that their rates were reasonable and adequate, 42 C.F.R. § 447.252(b); and (3) to assure reasonable access to inpatient hospital care, 42 C.F.R. § 447.256. By enacting the Boren Amendment, Congress intended to require only "the minimum level [of oversight] necessary to assure proper accountability, and not to burden States and facilities with unnecessary paperwork requirements." 48 Fed.Reg. 56,047.

HCFA, in its attempt to carry out this congressional intent (i.e., to allow states to develop their own programs to meet the needs of Medicaid patients), did not provide specific criteria for states to follow when determining "reasonable and ade-

quate" rates under 42 U.S.C. § 1396. Nor did HCFA verify the proposed "findings" provided by the States under the statute; instead, HCFA examined only the assurances submitted to determine if they were "adequate." *See, e.g.,* 42 C.F.R. §§ 447.298, 447.252(b), 447.256. In other words, the federal government, under the Boren Amendment, left to the states the bulk of the decisions relating to Medicaid disbursements. According to HCFA, at the time appellees brought suit in 1995, in the decade-and-a-half that the Boren Amendment existed, *no state plan, including those plans that did not provide for out-of-state reimbursement, was ever rejected* for failure to comply with the Amendment's strictures.

The Boren Amendment, however, did impose some requirements on state Medicaid programs. For example, the Amendment required each state to make "findings" that such payments as they did make to *each* hospital for all services rendered to Medicaid-eligible patients were no more than what would have been charged by an "efficiently" and "economically" operated institution. *See, e.g.,* 42 C.F.R. 447.252(b). According to HCFA, this was a provider-specific determination. Thus, even if an out-of-state facility only provided services to one California Medicaid patient, California, upon receiving a bill for services rendered, was required to audit that institution to determine whether the rate charged by the facility was reasonable.

Congress in 1997 apparently decided that the Boren Amendment had become too cumbersome for states to follow. *See Exeter Memorial Hosp. Ass'n v. Belshe,* 145 F.3d 1106, 1108 (9th Cir.1998). As of October 1, 1997, the Boren Amendment was repealed and replaced with a "public process" statute to determine rates for Medicaid reimbursement and eliminated the "findings" and "assurances" provision contained within the Boren Amendment. *See* 42 U.S.C. § 1396a(a)(13)(A) (1998). Notwithstanding the Boren Amendment's repeal, HCFA distributed a letter to state Medicaid agencies, informing them that, until such time that they switched to the "public process" method of reimbursement, they could continue to operate under the Boren rubric. California has not yet implemented a Medicaid program to comply with the new "public process" method and continues to make payments to Medicaid patients pursuant to the guidelines set forth in the Boren Amendment.

## II.

This case raises only one issue: Does the Boren Amendment apply to out-of-state providers? We first look to the language of the Boren Amendment for the answer to this question. *See Queen of Angels/Hollywood Presbyterian Med. Ctr. v. Shalala,* 65 F.3d 1472, 1477 (9th Cir. 1995). It states, in pertinent part, that a state plan for medical assistance must:

> provide ... for payment ... of the hospital services ... provided under the plan through the use of rates (determined in accordance with the methods and standards developed by the State ... and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ... ) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each hospital ... and periodic audits by the State of such reports....

42 U.S.C. § 1396a(a)(13)(A).

Specifically, the issue before us is the scope of the phrase "hospital services."

Appellees contend that "hospital services" refers to both in-state and out-of-state providers, whereas appellants argue that "hospital services" refers only to in-state providers. The majority concludes that "[b]ecause the statute does not distinguish between in-state and out-of-state hospitals, the plain meaning of the statute is that Congress did not intend to differentiate between the two." Maj. Op. at 1096. In essence, the majority's position rests on a negative inference. It argues that because Congress *did not specifically state* that Boren applies to *only* in-state hospitals, it must have intended that the statute applies to both in-state and out-of-state hospitals. I disagree.

Admittedly, neither party presents strong evidence to support its respective "plain language" interpretation of the Boren Amendment. Appellant, for example, relies on another provision of the Medicaid statute, 42 U.S.C. § 1396r–4(b)(1)(A), which sets forth the requirements that a hospital must meet to be considered a disproportionate share hospital for purposes of the Boren Amendment. The statute states that a hospital will qualify as a disproportionate share hospital only if it compares favorably to the mean of "hospitals receiving medicaid payments *in the State.*" 42 U.S.C. § 1396r–4(b)(1)(A) (1998) (emphasis added). This language, appellant contends, demonstrates that the Boren Amendment applies only to in-state hospitals.

This argument overlooks the fact that § 1396r–4(b)(1)(A) does not refer to the scope of the Boren Amendment. Its purpose is to determine whether an "in-state" hospital qualifies as a disproportionate share hospital. That is, it requires a state to calculate whether a hospital has a certain percentage of Medicaid patients relative to other hospitals "*in the State.*" It does not refer to reimbursement procedures; instead, it sets forth the method by which a state is to determine if a hospital within the state cares for a sufficient number of Medicaid patients to qualify for status as a disproportionate share hospital.

Appellees, on the other hand, contend that, because the statute does not distinguish between in-state and out-of-state hospitals, it is clear that Congress did not intend to differentiate between the two. The majority accepts this contention. Thus, the failure of Congress to delineate the boundaries of the Boren Amendment is said to warrant the conclusion that the Boren Amendment applies to all hospitals in the United States. I disagree.

The statute is ambiguous. It follows that to determine the scope of the phrase "hospital services" we must consider both the legislative intent behind the enactment of the statute and any "reasonable interpretation" proffered by HCFA, the implementing agency.

### III.

Because the "plain language" fails to provide sufficient guidance as to the scope of the term "hospital services," we are required to take the second step of the *Chevron* inquiry: "[T]he question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d 694. The majority improperly avoided this question by concluding that the statute is unambiguous. The district court, however, did reach this issue and erred. Instead of deferring to the reasonable interpretation of the Boren Amendment enunciated by HCFA, the district court adopted what it considered a "more reasonable" interpretation of the statute. To do so was clearly inappropriate under *Chevron.* As we have stated in the past, we need not conclude that HCFA's interpretation of the Boren Amendment is "the only reasonable one, or even the 'best' one." *Queen of Angels,* 65 F.3d at 1477. We need *only conclude* that it is a "permissible" one. *See Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 414, 113 S.Ct. 2151, 2159, 124 L.Ed.2d 368 (1993). We should so conclude.

It is true, as pointed out by the court below, that HCFA had not issued adminis-

trative regulations that resolved the interpretation of the Boren Amendment at the time appellees brought suit. As a consequence, the district court properly invited the United States, on behalf of HCFA and the Secretary of Health and Human Services, to submit a brief outlining its interpretation of the Amendment. In response, the United States submitted a detailed brief opining that the Boren Amendment *did not* apply to out-of-state hospitals. The district court subsequently rejected that interpretation in favor of its own interpretation of the amendment. It declined to adopt HCFA's interpretation because, in the words of the district court, such an interpretation was "inconsistent" with the agency's prior interpretations of the Amendment.

I disagree with that conclusion for two reasons: (1) HCFA's proposed interpretation of the Boren Amendment is reasonable, and (2) even if HCFA's interpretation was inconsistent with its prior interpretations of the Amendment, that is of no consequence. The position HCFA has taken is a reasonable one. It should be the controlling one.

## A. *HCFA's Interpretation of the Boren Amendment.*

HCFA, in concluding that the Amendment does not apply to out-of-state hospitals, based its position upon the tenet that the Boren Amendment was enacted to provide "greater flexibility" to the participating states and that applying the Amendment to out-of-state hospitals would have created an administrative morass that Congress could not have intended. The Boren Amendment, to repeat, required a state to audit every provider of health care services to Medicaid patients to determine whether the provider charges reasonable rates. In its brief to the district court, HCFA noted that if it required states to apply this rubric to out-of-state providers, states such as California would have to analyze data for *each* out-of-state facility even if that facility ultimately cares for only one of its residents. Moreover, HCFA noted that if it required states to

apply the Boren Amendment to out-of-state hospitals, states would need to employ experts to learn licensure laws of other states to determine whether facilities in other states have adequate staff and are running "efficiently" and "economically." In short, according to HCFA, the costs would be overwhelming and would defeat the purpose of the Boren Amendment.

The legislative history of the Boren Amendment also influenced HCFA in formulating its interpretation of the statute. It pointed out that the stated intent of the Amendment was to provide states with the maximum amount of flexibility in setting payment rates. HCFA noted that it would make little sense under this framework to require states to obtain information regarding every out-of-state provider that provides services to even one Medicaid eligible resident.

Instead, HCFA concluded that another provision, known as the "equal-access" provision, governs the reimbursement of out-of-state providers. It relied on 42 U.S.C. § 1396a(a)(30)(A), and argued to the district court that this statute, not the Boren Amendment, regulates state payments to out-of-state providers. That provision, requires, in pertinent part that a state plan

> provide for methods and procedures relating to ... the payment for[ ] care and services available under the plan ... to assure that payments are consistent with efficiency, economy and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A) (1998).

HCFA concluded that this "equal access" provision is better tailored to ensure that states are providing adequate reimbursement to out-of-state providers of medical services to Medicaid patients because it is less burdensome than applying the Boren Amendment. In short, in the

view of HCFA, this provision requires a state to ensure that its payments to out-of-state providers are *reasonable* without requiring the state to engage in a facility-specific analysis for every provider in every state where a patient may receive services.

This interpretation of the Medicaid statutory scheme is reasonable. Whether it is the best interpretation or the most fair interpretation is not controlling. It is a reasonable one. Therefore, in obedience to the Supreme Court's dictates in *Chevron*, I would hold that it is a permissible interpretation of an ambiguous statute. Because HCFA, not the courts, is entrusted with carrying out the provisions of Medicaid, I would defer to its interpretation of this ambiguous statutory provision.

### B. *The District Court's Inconsistency Argument.*

The district court erred when it disregarded HCFA's interpretation because it found it "inconsistent." In the *Chevron* decision itself, the administrative agency charged with implementing the relevant statute had changed its interpretation of the challenged statute multiple times. The respondents in *Chevron* contended that because the agency changed its interpretation of the statute so often, the Court should have afforded it no deference. The

Supreme Court disagreed and noted that: "The fact that the agency has from time to time changed its interpretation of the" relevant statute "does not ... lead us to conclude that no deference should be accorded the agency's interpretation of the statute.... [T]he agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863–64, 104 S.Ct. at 2792, 81 L.Ed.2d 694.

In ignoring HCFA's interpretation, the district court offered no reason other than the fact that HCFA supposedly changed its position regarding the interpretation of the Boren Amendment over time.[1] This is not determinative. Had HCFA, for example, changed its position because it somehow was in its advantage to do so, one should be inclined to reject its interpretation of the statute. That did not happen in this case, however. Therefore, we should defer to HCFA's good faith attempt to interpret a complex statute with which it was charged to implement.

For the foregoing reasons, I respectfully dissent.

---

1. Moreover, I do not believe that HCFA's position on this issue was at all inconsistent. The district court noted that HCFA, before the filing of this lawsuit, had never officially announced its position on the interpretation of the Boren Amendment. The court below instead relied on a district court decision, *Multicare Medical Center v. Washington*, 768 F.Supp. 1349, 1401 (W.D.Wash.1991), to reach its conclusion that HCFA has been inconsistent in its position on the applicability of the Boren Amendment to out-of-state hospitals. In *Multicare*, the district court concluded that the Boren Amendment required Washington to make payments to out-of-state providers. In reaching its conclusion, the district court relied on correspondence between a HCFA regional office and the State of Washington. HCFA's Central Office, however, had never announced a policy that embraced the view of its regional office.

According to HCFA, only its Central Office actually has the authority to announce such policies. It was of no consequence, therefore, that a regional office concluded otherwise.

The district court relied on similar correspondence between a HCFA regional office and California to support its position. HCFA offered two plausible explanations for this correspondence as well. First, HCFA notes that the correspondence never expressly states that the Boren Amendment applies to out-of-state hospitals. Second, HCFA notes that even if we were to construe this correspondence as declaring that the Boren Amendment applies to out-of-state hospitals, this view represents only the views of a regional office not empowered to make centralized HCFA policies.

I find HCFA's explanations sufficient and would find no inconsistency.