101 P.3d 1149

**Joseph BYNUM and Lila Bynum,**
**Plaintiffs–Appellees**

v.

**Joanna H. MAGNO, M.D.,**
**Defendant–Appellant.**

No. 25834.

Supreme Court of Hawai'i.

Nov. 18, 2004.

As Amended Dec. 2, 2004.

Howard F. McPheeters, Honolulu, (Orly Degani of Horvitz & Levy and Jan M. Tamura and John Reyes–Burke of Burke Sakai McPheeters Bordner Iwanaga & Estes with him on the briefs) for defendant-appellant.

Thomas Benedict (David J. Dezzani and Anne T. Horiuchi, Honolulu, of Goodsill Anderson Quinn & Stifel with him on the brief) for plaintiffs-appellees.

Thomas R. Grande, Honolulu,(Davis Levin Livingston Grande) on the brief for amicus curiae AARP.

ACOBA, J., Circuit Judge POLLACK, in Place of NAKAYAMA, J., Recused, and Circuit Judge DEL ROSARIO, Assigned by Reason of Vacancy; and MOON, C.J., Dissenting, With Whom LEVINSON, J., Joins.

Opinion of the Court by ACOBA, J.

We have jurisdiction pursuant to Hawai'i Revised Statutes (HRS) § 602-5(2) (1993) and Hawai'i Rules of Appellate Procedure (HRAP) Rule 13(a) (2000)[1] to answer the following certified questions by the United States District Court for the District of Hawai'i (the district court)[2] to this court:

> Where a plaintiff's healthcare expenses are paid by Medicare and/or Medical, does the discounted amount paid to a healthcare provider by [Medicare[3]] and Medi–Cal constitute the amount that should be awarded as medical special damages to a plaintiff in a negligence action? In this circumstance, is evidence of amounts billed in excess of the amount[ ]paid irrelevant and inadmissible?

For the reasons set forth herein, the answer to both questions is "no."

---

1. HRAP Rule 13(a) provides in relevant part as follows:

    **(a) When certified.** When a federal district or appellate court certifies to the Hawai'i Supreme Court that there is involved in any proceeding before it a question concerning the law of Hawai'i that is determinative of the cause and that there is no clear controlling precedent in the Hawai'i judicial decisions, the Hawai'i Supreme Court may answer the certified question by written opinion.

2. With the consent of both parties, this case was reassigned to Magistrate Judge Kevin S.C. Chang, pursuant to 28 U.S.C. § 636(c)(1).

3. Although the district court question actually used the term "Medicaid," it appears the district court meant to use the term "Medicare" as previously stated. Inasmuch as Medi–Cal is a "Medicaid" program, as explained *infra*, the use of "Medicaid" appears redundant. *See infra* Part III.

## I.

The questions posed arise out of a medical malpractice action in which Plaintiffs–Appellees Joseph Bynum (Joseph) and his wife Lila Bynum (Lila) (collectively the Bynums), sued to recover damages for injuries Joseph allegedly suffered in connection with coronary artery bypass grafting surgery.

While vacationing on the Big Island of Hawai'i in July of 1998, Joseph experienced chest pains. Initially, Joseph went to North Hawai'i Community Hospital for treatment, and was later transferred to the Queen's Medical Center (Queen's) in Honolulu, for further treatment. Dr. Joana Magno (Magno), a cardiologist at Queen's, assumed responsibility for coordinating Joseph's care as his attending physician. Magno consulted with Dr. Michael Dang (Dang), a cardiovascular surgeon, and Dr. John Callan (Callan), a pulmonologist, and recommended that Joseph undergo bypass surgery on an urgent basis. Magno did not advise the Bynums that Joseph could try alternate treatments, such as medical therapy or angioplasty, but presented surgery as his only option. At the time Magno recommended bypass surgery, she knew Joseph had experienced respiratory failure two years earlier, and recognized that his history of lung disease was a "red flag" to bypass surgery.

During the bypass surgery performed by Dang, Joseph suffered respiratory distress, which required him to be placed on mechanical ventilation for the remainder of his life. After spending three months in Queen's, Joseph was transferred to six different intensive care facilities in California.

From the time of the surgery, Joseph was eligible for Medicare, which initially paid for his medical bills. However, to allow Joseph to become eligible for Medi–Cal, California's Medicaid program, and to protect their life savings from the costs of Joseph's ongoing

hospitalization, the Bynums legally divorced on February 11, 1999.[4]

Joseph lived in intensive care facilities for over 1,314 days after the surgery, and was dependent upon the ventilator for the rest of his life, passing away on February 21, 2002.

## II.

The Bynums filed a lawsuit against Magno, Dang, Callan, and Queen's (hereinafter, collectively, Defendants), on December 30, 1999, prior to Joseph's death.[5] During discovery, the Bynums produced medical bills, which reflected the "standard" or "customary" charges (hereinafter "standard rates") for the services provided by the medical facilities in which Joseph had resided. Prior to trial, the parties entered into a stipulation regarding those bills,[6] in which they agreed, *inter alia*, that the medical bills "reflect[ed] medical treatment for [Joseph] that was necessary for medical conditions that existed during the time of treatment[,]" and were for amounts "similar to charges made by similar or comparable health care providers for like services in the same geographical area."

On February 6, 2001, Magno and Callan filed a motion in limine to limit Joseph's recovery of his medical expenses to only those fees actually paid to his healthcare providers as full and final payment for the services. In this regard, Defendants sought to preclude the Bynums from introducing, as evidence of special damages, the standard rates for Bynum's medical care that might have been billed to other patients for comparable treatment. Additionally, Defendants asserted that "a patient cannot be held liable for any medical expenses that exceed the amount approved by Medicare or actually paid by Medicare and Medi–Cal payments to a healthcare provider."

The district court denied the motion, and did not limit the evidence of special damages to the amount charged by Medicare/Medic-

---

**4.** The Bynums maintain that although they were forced to "legally divorce," they did not divorce "in reality," and Lila continued to support Joseph throughout the remainder of his life.

**5.** Joseph died during the litigation of this dispute, and thus, the "Special Administrator" was substituted as a party to the action while it was

pending before the Ninth Circuit Court of Appeals.

**6.** The "Stipulation and Order Re: Statements Reflecting Medical Expenses" was filed on January 18, 2001.

aid. Accordingly, when the jury trial commenced on March 13, 2001, the medical bills introduced reflected amounts similar to charges made by comparable health care providers for like services in the same geographical area.

The jury returned it's verdict on April 4, 2001, and on May 2, 2001, the district court entered judgment against Magno in the amount of $2,063,750.00 for Joseph ($1,462,500.00 in special damages and $601,250 in general damages), and $107,250 for Lila (in general damages). Additionally, the district court dismissed with prejudice all claims against Callan, Dang, and Queen's, pursuant to a stipulation for partial dismissal.

Magno appealed the judgment to the United States Ninth Circuit Court of Appeals (the Ninth Circuit), asserting, *inter alia*, that "the district court erred by submitting the amount of the medical expenses billed by [Joseph's] healthcare providers to the jury as the reasonable value of their services, instead of the lesser amount negotiated by [Medicare/Medicaid]." The Ninth Circuit reversed the district court's judgment and remanded the case for a new trial.[7] Declining to resolve the issue of special damages, the Ninth Circuit posited that

> the novel question under Hawai'i law whether the discounted amount paid to a healthcare provider by Medicaid[[8]] and Medi–Cal reflects the amount that should be awarded to a plaintiff in a negligence action might well be a suitable candidate for certification.

7. The Ninth Circuit issued its decision on March 13, 2003, in an unpublished memorandum opinion.

8. It is presumed the Ninth Circuit meant "Medicare." *See supra* note 3.

9. Medicare is the federally funded medical insurance program for the elderly and disabled established as part of the Social Security Act, and is funded and administered solely by the federal government. 42 U.S.C. §§ 1395 *et seq* (hereinafter, the Medicare Act); *Fischer v. United States*, 529 U.S. 667, 671–75, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000).

10. Medcaid is a medical insurance program jointly funded by the federal and state governments, but administered by the individual states. 42 U.S.C. §§ 1396 *et seq* (1973) (hereinafter the

Accordingly, the district court, upon remand, submitted its certified questions to this court.

## III.

Joseph's healthcare providers, as required of provider participants in the Medicare[9] and/or Medicaid[10] (hereinafter Medicare/Medicaid) programs, agreed in advance to accept the Medicare/Medicaid approved payments as full and final payment for their services. Such payments are set at rates lower than the standard rates that providers might charge other patients who did not participate in these programs. These payments then, by definition and as posed by the Ninth Circuit, are "discounted" from the standard rates otherwise charged for comparable medical treatment. Joseph's healthcare providers, as participants in these programs, were statutorily prohibited from "balance billing" Joseph or any other source for amounts above the Medicare/Medicaid approved charges.

## IV.

In response to the certified questions presented, the parties raise several arguments. Magno argues that a plaintiff whose health care expenses are covered by Medicare/Medicaid, is entitled to recover the amount of the Medicare/Medicaid approved payments, and nothing more, because (1) principles of compensatory damages do not permit recovery for more than the actual costs incurred for medical services; (2) the collateral source rule does not entitle a plaintiff to recover

Medicaid Act); 42 C.F.R § 430.0 (2004); *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1093–94 (9th Cir.1999). Medicaid "authorizes the payment of federal funds to states to defray expenses incurred in providing medical assistance to low-income individuals," *id.* at 1093, namely on behalf of families with dependent children, and of aged, blind, or disabled individuals. 42 U.S.C. §§ 1396 *et seq.*; 42 C.F.R. § 430.0. "Medi–Cal" is California's Medicaid program, as administered by the California Department of Health. Welf. & Inst. §§ 14000 (1991) *et seq;* Cal.Code Regis. tit. 22, §§ 51501 (2004) *et seq.* Similarly, Hawai'i participates in the Medicaid program, as administered by the Hawai'i Department of Human Services. *See generally* HRS chapter 346; Hawai'i Administrative Rules (HAR) chapter 17.

amounts in excess of the Medicare/Medicaid approved payments, inasmuch as (a) the amount of the Medicare/Medicaid "discount" is not a "benefit" belonging to the plaintiff under the collateral source rule, (b) limiting a plaintiff's recovery to the amount of the approved payments does not result in a windfall to the defendant, and (c) unlike private insurance arrangements where the collateral source rule has been applied, this case does not involve the payment of premiums by the plaintiff; and (3) amounts billed in excess of the Medicare/Medicaid approved payments are irrelevant and inadmissible in a tort action.

The Bynums, on the other hand, assert that Joseph's recoverable medical expenses should be based upon the standard rates, because (1) the policies behind the recovery of damages for personal injury tort victims are not analogous to the principles of "compensatory damages" in property damage cases; (2) the collateral source rule applies, inasmuch as (a) the " 'discount[s]' created by the lower fee schedules" are "unquestionably a benefit to Medicare/Medicaid recipients[,]" (b) the programs "benefitted" Joseph by preventing the providers from "balance billing" him for the full amount, (c) if Joseph was not eligible for Medicare/Medicaid, "he would have been liable for the full amount of his medical bills," and thus, (d) "allowing [Magno] to reduce her liability by virtue of [Joseph's] participation in Medicare/Medicaid would indeed result in a windfall for [Magno], which is exactly what Hawai'i collateral source rule prohibits"; and (3) because the collateral source rule applies to all Medicare/Medicaid benefits, evidence of standard rates is relevant and admissible for (a) determining the reasonable value of medical services, (b) understanding the extent of the plaintiff's injuries, and (c) providing a foundation for future medical care and expenses.

AARP filed an amicus brief in this case. It maintains that millions of elderly and low income individuals rely on Medicaid for their health care, and urges this court to follow jurisdictions which have applied the collateral source rule to Medicare/Medicaid benefits. Essentially, ARRP argues two primary reasons for applying the collateral source rule.

First, AARP notes that a "court can either reward the tortfeasor by making them [sic] responsible for an amount less than the full amount of the plaintiff's medical services or a court can award the entire amount of damages to the injured person even though the victim did not pay for the services[; thus, i]f there is a windfall, the innocent plaintiff should benefit, not the defendant." Secondly, citing Joseph M. Engle, *Comment: Gratuitous Nursing Services Rendered by Extended Family Members and Other Third Parties: Can Injured Parties Receive Reimbursement Under Wisconsin's Collateral Source Rule?*, 85 Marq. L.Rev. 1003, 1009–10 (2002), AARP asserts that "[a]llowing a plaintiff to recover from collateral sources ensures that the plaintiff will be fully compensated[, a]n injured party can never be fully compensated for permanent injuries[,]" and, "[t]hus, while the collateral source rule may allow a plaintiff to receive a larger award than he or she appears entitled, the amount the plaintiff actually receives comes closer to full compensation for [the] loss."

## V.

Inasmuch as the questions presented involve the scope of special compensatory damages, the underlying principles relating to damages in the personal injury context are pertinent. Compensatory damages seek to "compensate the injured party for the injury sustained," *Kuhnert v. Allison,* 76 Hawai'i 39, 44, 868 P.2d 457, 462 (1994), in hopes of "restor[ing]" a plaintiff to his or her position prior to the tortious act[,]" *Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 327, 47 P.3d 1222, 1240 (2002) (Acoba, J., concurring). The law divides such "damages into two broad categories-general and special." *Ellis v. Crockett,* 51 Haw. 45, 50, 451 P.2d 814, 819 (1969). General damages "encompass all the damages which naturally and necessarily result from a legal wrong done[,]" *id.,* and include such items as "pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms." *Dunbar v. Thompson,* 79 Hawai'i 306, 315, 901 P.2d 1285, 1294 (App.1995) (citation omitted). Special damages are "the natural but not the necessary result of an alleged wrong[,]" *Ellis,* 51 Haw.

at 50, 451 P.2d at 819, and are "often considered to be synonymous with pecuniary loss and include such items as medical and hospital expenses, loss of earnings, and diminished capacity." *Dunbar*, 79 Hawai'i at 315, 901 P.2d at 1294.

The "collateral source rule,"[11] in general, provides that benefits or payments received on behalf of a plaintiff, from an independent source, will not diminish recovery from the wrongdoer. *Ellsworth v. Schelbrock*, 235 Wis.2d 678, 611 N.W.2d 764, 767 (2000). "Under the collateral source rule, a 'tortfeasor is not entitled to have its liability reduced by benefits received by the plaintiff from a source wholly independent of and collateral to the tortfeasor[.]'" *Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n*, 89 Hawai'i 269, 281, 971 P.2d 1104, 1116 (1999) (quoting *Sato v. Tawata*, 79 Hawai'i 14, 18, 897 P.2d 941, 945 (1995)).

Similarly, the Restatement (Second) of Torts: Damages (hereinafter Restatement) § 920A, entitled "Effect of Payments Made to [an] Injured Party," establishes that, under the collateral source rule, "[p]ayments made to or *benefits conferred* on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the tortfeasor is liable." Restatement § 920A(2) (emphasis added).[12] Comment b to § 920A, entitled "Benefits from collateral sources," further explains that although double compensation may result to the plaintiff, such a benefit should redound to the injured party rather than "become a windfall" to the party causing the injury:

The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount *there may be a double compensation for a part of the plaintiff's injury*. But it is the position of the law that a *benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor*.

Restatement § 920A cmt. b (emphases added). Ultimately, comment b explains that "it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives." *Id.*

While acknowledging that "[p]erhaps there is an element of punishment of the wrongdoer" in the rule, the Restatement indicates that "[p]erhaps also this is regarded as a means of helping to make the compensation more nearly compensatory to the injured party." *Id.* The Restatement further declares that the rule "that collateral benefits are not subtracted from the plaintiff's recovery applies to the following *types* of benefits: ... [g]ratuities[ ] ... [and s]ocial legislation benefits." Restatement § 920A cmt. c(3)-(4) (emphasis added). As to social legislation benefits, the Restatement explains that "[i]f the benefit was ... established ... by law, [the plaintiff] should not be deprived of the advantage that it confers." Restatement § 920A cmt. b.

With the aforementioned authorities in mind, we consider the certified questions.

## VI.

In an action to recover medical expenses caused by a defendant's negligence, a

---

11. The Restatement comment d explains that "[t]he collateral[ ]source rule is of common law origin." Restatement (Second) of Torts § 920A cmt. d (1979).

12. This court has many times relied on the Restatement (Second) of Torts as persuasive authority. *See, e.g., Hac v. Univ. of Hawai'i*, 102 Hawai'i 92, 106, 73 P.3d 46, 60 (2003) (adopting elements and approach of Restatement (Second) of Torts § 46 (1965) for tort of intentional infliction of emotional distress); *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 386, 742 P.2d 377, 384 (1987) (relying on Restatement (Second) of Torts § 314(A) (1965) to establish the duty of innkeeper to guest "to take reasonable action to protect the latter against unreasonable

risk of physical harm"); *Ono v. Applegate*, 62 Haw. 131, 137–38, 612 P.2d 533, 539 (1980) (citing Restatement (Second) of Torts § 285 (1965) to hold that Hawai'i's "liquor control statute does impose a duty upon a tavern keeper not to serve a person under the influence of liquor"); *Stewart v. Budget Rent–A–Car Corp.*, 52 Haw. 71, 75, 470 P.2d 240, 243 (1970) (adopting Restatement (Second) of Torts § 402A (1965) for strict products liability); and *Chun v. Park*, 51 Haw. 462, 468, 462 P.2d 905, 909 (1969) (adopting Restatement (Second) of Torts § 552 (Tentative Draft No. 12, 1966) as "a fair and just restatement of the law on the issue of negligent misrepresentation").

plaintiff must show that the medical services obtained were necessary and the charges were reasonable as required for the injuries sustained. *See Reinhardt v. County of Maui*, 23 Haw. 524, 527 (1916). In that connection, the "reasonable value"[13] of a plaintiff's medical services may be recovered. *See Kometani v. Heath*, 50 Haw. 89, 95, 431 P.2d 931, 936 (1967) (affirming that it was proper for the jury to consider the "reasonable value" of future medical expenses); *Walsh v. Chan*, 80 Hawai'i 188, 193, 907 P.2d 774, 779 (App.) (acknowledging the lower court's jury instructions as stating that a plaintiff is entitled to damages for the "reasonable value of the medical services"), *rev'd on other grounds*, 80 Hawai'i 212, 218, 908 P.2d 1198, 1204 (1995).

Although the parties do not dispute that the medical bills introduced at trial reflected medical services necessary for Joseph's medical condition, they disagree, as previously mentioned, on how to calculate the "reasonable value" of such services in light of the Medicare/Medicaid benefits.

## VII.

### A.

Magno points to cases which have concluded that the Medicaid/Medicare programs and rates do not fall within the scope of the collateral source rule. Such cases have based their decisions on essentially two grounds: (1) no one incurs liability for any charges above the Medicare/Medicaid payments,[14] *see Suhor v. Lagasse*, 770 So.2d 422, 427 (La.Ct.App.2000); *Terrell v. Nanda*, 759 So.2d 1026, 1031 (La.Ct.App.2000); *Hanif v.*

*Housing Auth.*, 200 Cal.App.3d 635, 246 Cal. Rptr. 192, 195–97 (Ca.App.1988); *Dyet v. McKinley*, 139 Idaho 526, 81 P.3d 1236, 1239 (2003), and (2) because no consideration is exchanged, Medicare/Medicaid discounts are not "benefits of the bargain" received by beneficiaries as a result of obtaining Medicare/Medicaid insurance. *See Suhor*, 770 So.2d. at 427. Inasmuch as the collateral source rule applies to both gratuities and social legislation benefits, we believe such arguments are not determinative of the applicability of the rule.

### B.

As previously noted, the Restatement declares that the collateral source rule applies to "gratuities," explaining, for example, that "the fact that the doctor did not charge for his services or the plaintiff was treated in a veterans hospital does not prevent his recovery for the reasonable value of the services." Restatement § 920A, cmt. c(3). *See Pryor v. Webber*, 23 Ohio St.2d 104, 263 N.E.2d 235, 240 (1970) (explaining that the great weight of authority is that the payment of wages, whether the result of a contract or simply a gratuity does not reduce the damages otherwise recoverable); *see also Roundhouse v. Owens–Illinois, Inc.*, 604 F.2d 990, 994 (6th Cir.1979) (explaining that the collateral source rule applies even if payments are gratuitous). Hence, whether anyone incurs liability for any charges, or whether such benefits are "bargained for" or contractual in nature, is not determinative as to whether the rule applies. *See Ellsworth*, 611 N.W.2d at 767–69 (concluding that the collateral source rule allows recovery of the reasonable

---

**13.** The term "reasonable value," in the context of awarding damages for medical expenses, has not expressly been defined in this jurisdiction. *Black's Law Dictionary* 1265 (6th ed.1990) defines "reasonable" as "[f]air, proper, just, moderate, suitable under the circumstances. Fit and appropriate to the end in view. Having the faculty of reason; rational; governed by reason; ... Not immoderate or excessive, being synonymous with rational, honest, equitable, fair, suitable, moderate, tolerable." (Citation omitted.) Black's Law Dictionary describes "value" in part as, "[t]o estimate the worth of; to rate at a certain price; to appraise; or to place a certain

estimate of worth on in a scale of values." *Id.* at 1551 (citation omitted).

**14.** This is essentially the dissent's position. *See* dissenting opinion at 96–97, 98–99, 101 P.3d at 1164–1165, 1166–1167. The proposition that a plaintiff's "recovery of medical expenses must be limited to the amount he or she has paid or became legally obligated to pay," *id.* at 96, 101 P.3d at 1164, fails to acknowledge our adoption of the collateral source rule. Hence, "recovery" under our own case law is not necessarily coincident with the amount a plaintiff "has paid or became legally obligated to pay," *id.*, as the dissent would argue.

value of medical services without consideration of gratuitous medical services rendered or payments made by outside sources on the plaintiff's behalf). Gratuitous services and payments, by their very nature, are given without consideration, are not "benefits of the bargain," and do not impose any legal obligation of repayment.

Rather, because a plaintiff would be able to recover the "reasonable value" of medical services if such services were rendered gratuitously, it would appear to follow that a plaintiff should be allowed to recover the "reasonable value" of such services, even if Medicare/Medicaid had already paid a part, or a discounted amount, of the "reasonable value" of such services. *See Pryor*, 263 N.E.2d at 238–39 (acknowledging that the collateral source rule has been applied to "gratuitous physician's fees" as well as medical expenses gratuitously paid by a plaintiff's brother). Because a plaintiff like Joseph is not required to pay the difference between the standard rate and the Medicare/Medicaid payment, that part of such medical services attributable to such difference could be viewed conceptually as gratuitous service to the plaintiff, so as to come within the collateral source rule.

## C.

■ But, as previously observed, the Restatement applies the collateral source rule to certain "types" of benefits such as social legislation benefits, listed as "social security benefits, welfare payments, pensions under special requirement acts." Restatement § 920A, cmt. c(4). Medicare/Medicaid are medical insurance programs for those in need, such as the elderly, disabled, and low-income individuals. *See Suhor*, 770 So.2d at 424 (explaining that "Medicare is our country's basic health insurance program for people 65 or older and many people with disabilities"); *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1093–94 (9th Cir.1999) (relating that Medicaid provides federal and state funds to "defray expenses incurred in providing medical assistance to low-income individuals").

As aptly described by the North Carolina Supreme Court, "Medicaid is a form of insurance paid for by taxes collected from society in general. The Medicaid program is social legislation; it is the equivalent of health insurance for the needy." *Cates v. Wilson*, 321 N.C. 1, 361 S.E.2d 734, 737–38 (1987) (citation omitted); *see also Ellsworth*, 611 N.W.2d at 768; *Suhor* 770 So.2d at 424; *Children's Hosp. & Health Ctr.*, 188 F.3d at 1093–94. Likewise, this court has recognized that the "purpose of medicaid is to provide assistance to those whose income and resources are inadequate to meet the costs of necessary medical services." *Barham by Barham v. Rubin*, 72 Haw. 308, 312, 816 P.2d 965, 967 (1991). Thus, Medicare/Medicaid payments are a "type" of social legislation benefits.

Accordingly, we cannot agree with Magno's assertion that Medicare/Medicaid programs are simply fee "agreements between the government and healthcare providers for their mutual benefit, *independent of the interests of Medicare/Medicaid recipients.*" (Emphasis added.) Although Medicare/Medicaid programs involve fee agreements that are mutually beneficial to the government and the participating healthcare providers, such accommodations appear secondary to the essential purpose of Medicare/Medicaid, which is to provide medical assistance to the needy.

This court has followed the same approach. In *Sam Teague*, this court agreed with the United States Supreme Court that unemployment benefits paid by the state to the plaintiff, "were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state," which "plainly show[s] the benefits to be collateral." 89 Hawai'i at 283, 971 P.2d at 1118. In much the same way, the Medicaid/Medicare programs provide benefits for plaintiffs "from a source wholly independent of and collateral to the tortfeasor[.]" *Id.* at 281, 971 P.2d at 1116 (citations omitted). Because the Medicare/Medicaid program prohibits "balance billing," the difference between the standard rate and the Medicare/Medicaid payment may be viewed as a part of the "benefits conferred on the injured party" within the

scope of the collateral source rule. Restatement § 920A(2).

█ Inasmuch as Medicare/Medicaid are social legislation programs, we conclude that the collateral source rule applies to prevent the reduction of a plaintiff's award of damages to the discounted amount paid by Medicare/Medicaid.[15] *See Haselden v. Davis*, 353 S.C. 481, 579 S.E.2d 293, 294 n. 3 (2003) (holding that "the collateral source rule applies to Medicaid payments"); *Brandon HMA, Inc. v. Bradshaw*, 809 So.2d 611, 619 (Miss.2001) (holding, by the Supreme Court of Mississippi, "that Medicaid payments are subject to the collateral source rule"); *Ellsworth*, 611 N.W.2d at 767 (applying the collateral source rule to medical expenses paid directly by Medicaid); *Cates*, 361 S.E.2d at 738 (explaining that Medicaid is "social legislation; it is the equivalent of health insurance for the needy" and "is an acceptable collateral source"); *Thoreson v. Milwaukee & Suburban Transp. Co.*, 56 Wis.2d 231, 201 N.W.2d 745, 752 (Wis.1972) (holding that the collateral source rule applies to Medicare, and "is not limited to paid-for benefits but applies to gratuitous medical services provided or paid for by the state"); *see also* Restatement § 920A cmt. c (explaining that "so-

cial legislation benefits" are subject to the collateral source rule); *cf. Sato*, 79 Hawai'i at 18, 897 P.2d at 945 (referring to the collateral source rule and HRS § 386–8 in prohibiting evidence of compensation benefits for the sole purpose of reducing the amount of the plaintiff's recovery). Therefore, we hold that the collateral source rule prohibits reducing a plaintiff's award of damages to reflect the discounted amount paid by Medicare/Medicaid.[16]

## VIII.

Other jurisdictions have applied similar rationale in deciding that the reasonable value of medical services should be determined in light of the standard rates, rather than the amount paid to Medicare/Medicaid. *See Ellsworth*, 611 N.W.2d at 767–70; *Haselden*, 579 S.E.2d at 294–95. *Ellsworth* exemplifies these jurisdictions. In *Ellsworth*, as in the present case, the parties disputed whether the "reasonable value" of "medical assistance" benefits provided by the government[17] should be limited to the actual amount paid to the health care provider, or the reasonable value of such medical service which was substantially higher. *Ellsworth*, 611 N.W.2d at 766–68. The court there indi-

---

**15.** Of course, no "new category of damages" is created as the dissent would contend. Dissenting opinion at 97, 101 P.3d at 1165. Under our law, the "reasonable value" of medical expenses may be awarded as special damages and the collateral source rule will apply under the appropriate circumstances. Hence, such an application of our law does not "deviat[e] from ... precedent." *Id.* at 98, 101 P.3d at 1166. The "policy" considerations sought by the dissent, *see id.*, inhere in the rationale set forth in the authorities referred to and quoted and our discussion herein.

**16.** The dissent is incorrect in asserting that allowing Joseph to "recover more than ... he is legally obligated to pay contravenes Hawai'i's compensatory special damages law by restoring him to a position *better* than he would have been had the wrong not been committed-*i.e.*, Joseph will be *over* compensated." Dissenting opinion at 97, 101 P.3d at 1165 (emphases in original). In *Sam Teague*, the employer argued "that the circuit court erred by failing to reduce the award of back pay by the amount of unemployment benefits received by [employee]" covering the same period as the back pay. 89 Hawai'i at 281, 971 P.2d at 1116. The circuit court in *Sam*

*Teague* had "affirmed the Commission's back pay award of $16,900 ... [although the employee] received $8,322 in unemployment insurance benefits." *Id.* This court held that "unemployment benefits should not be deducted from awards of back pay under our employment discrimination law." *Id.* at 283, 971 P.2d at 1118. This was because "[a]lthough collateral source payments represent *additional benefits* to [the employee], as between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer." *Id.* at 282, 971 P.2d at 1117 (internal quotation marks and citation omitted). Despite the dissent's attempt to limit *Sam Teague*, dissenting opinion at 99–100, 101 P.3d at 1167–1168, this court expressly confirmed that under the collateral source rule, the plaintiff does recover additional compensation and arguably is placed in a position better than he or she would be in were the collateral source rule not applied, inasmuch as the wrongdoer should not profit from third party benefits.

**17.** From the references in the case, such benefits would include Medicare, *Ellsworth*, 611 N.W.2d at 767, and Medicaid, *id.* at 768.

cated that "Medical Assistance is a means of providing gratuitous medical services paid for by the state ... for certain low-income individuals" that is "funded jointly by the federal and state governments." *Id.* at 767. The Supreme Court of Wisconsin rejected the tortfeasor's argument that "because [the plaintiff] did not personally incur any liability for her medical expenses she is not entitled to an award of damages ... or to the benefit of ... the collateral source rule." *Id.* at 768.

It explained that "[t]he general rule is that a plaintiff who has been injured by the tortious conduct of the defendant is entitled to recover the *reasonable value* of medical and nursing services reasonably required by the injury. This is a recovery for their value and *not the expenditures actually made or obligations incurred.*" *Id.* at 769 (quoting 22 Am.Jur.2d *Damages* § 207 (1965) (emphases added)). According to the Wisconsin court, under this general rule, "medical and nursing services rendered gratuitously ... [would] not preclude the injured party from recovering the value of those services as part of his compensatory damages. *Id.* (quoting 22 Am. Jur.2d *Damages* § 207). Hence, it held that "the injured plaintiff may recover the reasonable value of gratuitous medical services as part of his compensatory damages." *Id.*

As to defendant's argument "that recovery for past medical expenses should be limited to the amount paid by Medical Assistance because this amount is the reasonable value of services provided," *id.*, the Wisconsin court declared that "in most cases" the reasonable value of medical costs "is the actual expense, but in some cases it is not. *But the test is the reasonable value, not the actual charge.*" *Id.* (emphasis in original).

It explained that "[t]he collateral source rule seeks to place upon the tortfeasor full responsibility for the loss he has caused," such that the tortfeasor "is not entitled to reap the benefit of [plaintiff's] eligibility for public assistance or from the government's economic clout in the health care market place." *Id.* Hence, the *Ellsworth* court rejected the defendant's arguments that the "reasonable value" of medical services should be limited to the "amount paid" by Medicaid. *Id.*

Similarly, the Supreme Court of South Carolina, in *Haselden,* held that "the collateral source rule applies to Medicaid payments," 579 S.E.2d at 294 n. 3, indicating that an award for medical damages should reflect the standard rates for medical services, and should not be reduced to the discounted amount paid by Medicaid. The appellate court declared that "[c]learly, the *amount actually paid for medical services does not alone determine the reasonable value* of those medical services[, n]or does it limit the finder of fact in making such a determination." *Id.* at 295 (emphasis added) (citations omitted). The court explained that limiting "damages in the amount actually paid by Medicaid is contrary to the purposes behind the collateral rule and would result in a windfall to the defendant tortfeasor." *Id.* Thus, the South Carolina Supreme Court determined that recovery for medical expenses was "not limited by the amounts paid by Medicaid." *Id.* at 294 n. 3.

## IX.

While other jurisdictions have limited medical special damages to medical expenses paid, these decisions appear to have rested upon the courts' interpretation of specific language in a state statute,[18] to have misapplied the Restatement,[19] or to have been

18. *See Horton v. Channing,* 698 So.2d 865, 868–69 (Fla.App.1997) (relying on Florida damages statute, Section 768.21, which states that recovery for damages is permitted for "[m]edical ... expenses due to the decedent's injury ... that were *paid by or an behalf of [a] decedent* "); *Hanif,* 246 Cal.Rptr. at 195–97 (relying on Cal. Civ.Code § 3359, interpreting "reasonable value" as "a term of limitation, not aggrandizement," and relying on Cal. Civ.Code § 1431.2(b)(1), interpreting medical expenses as "representing actual pecuniary loss"); *Nishiha-*

*ma v. City & County of San Francisco,* 93 Cal. App.4th 298, 112 Cal.Rptr.2d 861, 866 (2001) (relying on *Hanif, supra,* and Cal. Civ.Code § 1431.2(b)(1)); *Olszewski v. Scripps Health,* 30 Cal.4th 798, 135 Cal.Rptr.2d 1, 25, 69 P.3d 927 (Ca.2003) (relying on *Hanif, supra,* and Cal. Civ. Code, but urging a change).

19. *See Hanif,* 246 Cal.Rptr. at 196–97 (relying on Restatement § 911 cmt. h); *Nishihama,* 112 Cal. Rptr.2d at 866 (relying on *Hanif* ); *Olszewski,* 135 Cal.Rptr.2d at 25, 69 P.3d 927 (relying on

criticized or narrowed in their own jurisdictions.[20]

Two such jurisdictions, as relied on by Magno, have held that the "reasonable value" of medical services, in the context of awarding damages, is limited to the amount paid by Medicare/Medicaid. *See Hanif,* 246 Cal. Rptr. at 193–97 (interpreting medical expenses, in a case involving Medicaid, as "representing actual pecuniary loss"); *Moorhead v. Crozer Chester Med. Ctr.,* 564 Pa. 156, 765 A.2d 786, 790 (2001) (concluding, in a case involving Medicare, that the reasonable value of medical services was limited to the amount paid). Such cases are not persuasive, for aside from being distinguishable, both the *Hanif* and *Moorhead* courts relied on the explanation of the term "value" described in Restatement § 911, comment h. *See Hanif,* 246 Cal.Rptr. at 196–97; *Moorhead,* 765 A.2d at 789.

But as employed in § 911,[21] the term "value" means "the exchange value," and that

the exchange value of property or *services* is the amount of money for which the subject matter *could be exchanged or procured* if there is a market continually resorted by traders, or if no market exists, *the amount that could be obtained in the*

*usual course of finding a purchaser or hirer of similar property or services.*

(Emphases added.) Comment h only pertains to the "value of services rendered" in the context of ascertaining the "measure of recovery of a person *who sues for the value of his services tortiously obtained*" or when a plaintiff "seeks to recover for expenditures *made or liability incurred to third persons for services rendered.*" (Emphases added.) This definition of "value of services rendered" is inapplicable, for the present case does not involve a provider who is suing for the value of the medical services provided or who seeks to recover expenditures incurred to third persons.

On the other hand, Restatement § 924, entitled "Harm to the Person," is directly applicable to determining the reasonable value of medical services for an injured person. That section is part of the Restatement's topic of "Compensatory Damages for Specific Types of Harm." Restatement § 924 provides that "[o]ne whose interests of personality have been tortiously invaded[ [22]] is entitled to recover damages for the past or prospective ... reasonable medical and other expenses." Restatement § 924(c). Restatement § 924, comment f, entitled "Expenses," reaffirms that "an injured per-

*Hanif, supra,* but urging a change); *Moorhead v. Crozer Chester Med. Ctr.,* 564 Pa. 156, 765 A.2d 786, 790 (2001) (relying on Restatement § 911 cmt. h (1977), which specifically references the reasonable exchange value of "services tortiously obtained by the defendant's fraud or duress, or for the value of services rendered in an attempt to mitigate damages").

**20.** *See McAmis v. Wallace,* 980 F.Supp. 181, 185 (W.D.Va.1997)(mem.) (holding that plaintiff was not entitled to recover amounts "written off" under Virginia law), no longer good law following decision in *Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 322–23 (2000) (holding that under Virginia law plaintiff may present evidence of the full amount of his reasonable medical expenses without any reduction to reflect discounted amounts).

*See also Bates v. Hogg,* [22 Kan.App.2d 702,] 921 P.2d 249, 253 (1996)(precluding application of the collateral source rule when the provider contracted with Medicaid), restricted by *Rose v. [Via Christi Health System, Inc.,* 276 Kan. 539,] 78 P.3d 798, 803 (Kan.2003) (limiting *Bates* decision to Medicaid only); *Griffin v. Louisiana Sheriff's Auto Risk, Ass'n,* 802 So.2d 691, 714–15

(La.Ct.App.2001)(distinguishing *Suhor,* 770 So.2d 422, and *Terrell v. Nanda,* 759 So.2d 1026, and cases decided by the third and fifth Louisiana circuits as having been based on federal law, and concluding that the collateral source rule is applicable to contractual write-offs and that evidence of these amounts are to be excluded from a jury's consideration).

**21.** Restatement § 911, entitled "Value," falls within Chapter 47 on "Damages."

**22.** Restatement § 924, comment a, refers to the definition of "invasions of interests in personality, as defined in the Introductory Note to Chapter 2." The Introductory Note lists examples of "interests of personality" including, among others, "freedom from harmful bodily contact," and explains that "the freedom from bodily harm is given the greatest protection. It is protected not only against intentional invasion but against invasions caused by negligence, and also against invasions caused unintentionally and without negligence by activities so dangerous that the law requires them to be carried on at the risk of those whose activities they are." Restatement, Chapter 2, Introductory Note.

son is entitled to damages for all expenses and the *value of services* reasonably made necessary by the harm." (Emphasis added.) In line with the collateral source rule, comment f cites to § 920A, and instructs that "[t]he *value* of medical services made necessary by the tort can ordinarily be recovered *although they have created no liability or expense to the injured person, as when a physician donates his services.*"[23] *Id.* (emphasis added). Hence, we believe Restatement § 911, comment h, is not germane to the questions posed.

## X.

We concur, then, with those jurisdictions that have held that a plaintiff, injured by the tortious conduct of a defendant, is entitled to recover the reasonable value of medical services and is not limited to the expenditures actually paid by Medicaid/Medicare. *See Ellsworth*, 611 N.W.2d at 769 (explaining that "the test" for determining an award of medical expenses "is the reasonable value,

not the actual charge"); *Haselden*, 579 S.E.2d at 295 (explaining that the amount actually paid for medical services does not alone determine the reasonable value of those medical services); *see also* Restatement § 920A, cmt. b (explaining that "it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives").[24]

## XI.

Such a conclusion is consistent with the established practice in Hawai'i courts for determining special damages for medical services, as embodied in Hawai'i Civil Jury Instruction No. 8.9.[25] The instruction does not limit special damages to the amount charged, but instructs that plaintiffs are entitled to damages for "the *reasonable value* of the the the medical services provided." Hawai'i Civil Jury Instruction No. 8.9 (emphasis added). Jurors are thus instructed that plaintiffs are entitled to compensation for medical treat-

---

**23.** However, a statute may provide a third party with the right to apparently sue directly for recovery of expenses paid. Hence, comment f also provides that "there can be no recovery for services for which a third person may recover, as when a worker's compensation act gives an employer or insurance carrier a claim against the tortfeasor for medical expenses incurred on account of a worker." Restatement § 924 cmt. f.

**24.** Contrary to the dissent's contention, dissenting opinion at 6–9, no precedent is overturned inasmuch as the issue at hand has not been decided in this jurisdiction. Indeed, none of the parties argue that a decision such as this one, consistent with other decisions reaching the same or similar results, would result in overturning Hawai'i law. Both Bynum and Magno, in fact, agree that the *reasonable value* of medical services is a measure of medical special damages. Magno recognizes that "[t]he reasonable value of the services is an *upper limit* on the amount recoverable," although relying on Restatement § 911 cmt. h (1979).

Moreover, the compelling justification standard as to overturning precedent is inapplicable. That standard has been applied where specific precedent is overturned. *See, e.g., State v. Garcia*, 96 Hawai'i 200, 207, 29 P.3d 919, 926 (2001) (reaffirming and refusing to overrule *Gray v. Admin. Dir. of the Court, State of Hawai'i*, 84 Hawai'i 138, 931 P.2d 580 (1997) and *State v. Wilson*, 92 Hawai'i 45, 987 P.2d 268 (1999), where State has not demonstrated any compelling justification); *Dairy Rd. Partners v. Island*

*Ins. Co.*, 92 Hawai'i 398, 421–22, 992 P.2d 93, 116–17 (2000) (overruling *Hawaiian Ins. & Guar. Co. v. Blanco*, 72 Haw. 9, 804 P.2d 876 (1990) and *Hawaiian Ins. & Guar. Co. v. Brooks*, 67 Haw. 285, 686 P.2d 23 (1984)); *Francis v. Lee Enters., Inc.*, 89 Hawai'i 234, 239, 971 P.2d 707, 712 (1999) (overruling *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972)).

**25.** Hawai'i Civil Jury Instruction No. 8.9 states, in relevant part that:

If you find for plaintiff(s) on the issue of liability, plaintiff(s) is/are entitled to damages in such amount as in your judgment will fairly and adequately compensate him/her/them for the *injuries* which he/she/they suffered. In deciding the amount of such damages, you should consider:

. . . .

(3) The *reasonable value of the medical services* provided by physicians, hospitals and other health care providers, including examinations, attention and care, drugs, supplies, and ambulance services, reasonably required and actually given in the treatment of plaintiff(s) and the *reasonable value of all such medical services* reasonably probable to be required in the treatment of plaintiff(s) in the future.

(Emphases added.) The "reasonable value" formulation has been used in this jurisdiction for at least thirty-five years. *See Kometani*, 50 Haw. at 95, 431 P.2d at 936 (affirming that it was proper for the jury to consider the "reasonable value" of future medical expenses).

ment, but these damages are not limited to out-of-pocket expenses. *Id.*[26]

## XII.

Moreover, allowing a particular plaintiff to recover the reasonable value of medical services leads to a more just result. The consequences of a contrary approach may penalize the recipient of Medicare/Medicaid payments. AARP reports in its amicus curiae brief, that "[Medicare/Medicaid], parts of the Social Security Act, together compromise the nation's largest source of public health insurance ... and long term care services for the poorest and most vulnerable in society." AARP maintains that "[a]pplying the collateral source rule helps to ensure that low-income elderly and disabled individuals are treated equitably vis a vis privately insured individuals by compensating for aspects of the [Medicare/Medicaid] programs that would substantially limit, if not completely eliminate, the beneficiary's recovery of special damages." *Cf. Masaki v. Columbia Cas. Co.,* 48 Haw. 136, 142, 395 P.2d 927, 930 (1964) (citing *Kopp v. Home Mut. Ins. Co.,* 6 Wis.2d 53, 57, 94 N.W.2d 224, 225 (1959) for the proposition that "[i]t would lead to a highly absurd and socially undesirable result to construe the medical payments coverage clause of the defendant's [automobile] policy so as to hold that recovery for the costs of hospital services provided to the insured may be recovered in [the] case" where a person purchases an insurance policy that provides reimbursements, but not by a person enrolled in a group plan in which affiliated hospitals agree to provide certain hospital services for the payment of a premium).

**26.** There is no "sidestepping our long standing damages law and instead rel[ying] on the Restatement (Second) of Torts," as the dissent claims. Dissenting opinion at 98, 101 P.3d at 1166. As mentioned previously, (1) the collateral source rule is well established in our jurisdiction; (2) the Restatement is an authoritative source relied on in our case law; (3) decisions from other jurisdictions support the same holding; and (4) our trial practice, as reflected in jury instructions, is consistent with the outcome.

**27.** HRS § 346–37(d), entitled "Recovery of Payments and Costs of Medical Assistance," provides in pertinent part:

AARP observes that "federal and state law[s] require, as a condition of Medicaid eligibility, that beneficiaries assign rights to third party payment for medical expenses, including tort recovery. 42 U.S.C. § 1396k(a) (2003); [HRS] § 346–37 (2003).[27] ... Only after the federal and state governments are reimbursed for medical expenses, is the [Medicare/Medicaid] beneficiary entitled to payment. 42 U.S.C. § 1396k(b) (2003)." In this regard, AARP reasons that, "[b]ecause the tort recovery of individuals receiving care paid by private payers is not subject to a setoff by the government, *[Medicare/Medicaid] beneficiaries will always be entitled to less special damages.*" (Emphasis added.) Hence, AARP argues that "[a]pplying the collateral source rule in these cases helps to ameliorate the substantial gap in recovery of damages" between Medicare/Medicaid beneficiaries, and those who are privately insured.

## XIII.

The dissent contends that the majority's holding "allows the recovery of an amount which does not fall within one of the permissible categories of damages," thereby "creating a new category of damages without justification." Dissenting opinion at 98, 101 P.3d at 1166. This contention rests upon the dissent's conclusion that "[a]s a form of compensatory special damages," an award of "medical expenses is limited to the pecuniary loss" incurred by the plaintiff. *Id.* at 96, 101 P.3d at 1164. Despite the dissent's protestations to the contrary, no existing precedent in this jurisdiction has so held. This case comes before us by way of certified question based upon the Ninth Circuit and the federal district court's determination that the special

(d) The department [of Human Services], as to this right of reimbursement, shall also be subrogated to all rights or claims that a claimant has against the third person for all damages not to exceed the full extent of the costs of medical assistance ... furnished or to be furnished by the department. The department's right to full reimbursement of the costs of medical assistance ... as a subrogee of a claimant shall not be diminished by the recovery of any judgment, settlement, or award of an amount less than the value of the original or settled claim as perceived or calculated by the claimant or any other person.

damages issues certified herein presents a "novel question under Hawai'i law."

Moreover, limiting medical expenses to the pecuniary loss suffered by a plaintiff would mean, for example, that injured plaintiffs who received gratuitous medical services, were treated at a veteran's hospital, or were covered by medical insurance plans such as offered to Kaiser Hospital patients would *not* be entitled to recover any monetary amount from the tortfeasor (except perhaps nominal out-of-pocket fees), *see Masaki*, 48 Haw. at 138–39, 395 P.2d at 928, because, according to the dissent, plaintiff's recovery is limited to pecuniary loss, which would not be present in these situations. Not only would such an approach be contrary to the "great weight of authority in this country," *Pryor*, 263 N.E.2d at 240, but this approach is contrary to this jurisdiction's long established approach to allowing an injured plaintiff to recover for the "reasonable value of the medical services." *See* discussion *supra* part XI.

Finally, adoption of the dissent's position would create various new categories of plaintiffs, similarly injured whose recovery would depend upon the type of their insurance coverage, and not upon the nature of their injuries. The incongruity of the dissent's position is further evident for its effect on future medical expenses. Patients such as those receiving treatment at military hospitals and Kaiser would not be entitled to future medical expenses. This would inevitably invite trial disputes regarding the plaintiff's continuing indigency or the likelihood of a plaintiff's change in insurance coverage in the future and its consequential effect on the amount of recovery. *See infra* Part XIV.

## XIV.

Therefore, in answer to the district court's first question, the amount of medical special damages awardable to a plaintiff in a negligence action is not limited to the discounted amount paid to a healthcare provider by Medicare/Medicaid. Inasmuch as we hold that the collateral source rule prohibits reducing a plaintiff's award of medical special damages to reflect the discounted amount

paid by Medicare/Medicaid, we consider the district court's second question.

■■■ Because the "reasonable value" in awarding damages to a plaintiff for medical services is not limited to the amount billed to healthcare providers by Medicare/Medicaid, the answer to the district court's second question is, "No." As indicated previously, the standard rates are relevant and should be admissible for establishing the reasonable value of medical costs constituting such special damages. *See Haselden*, 579 S.E.2d at 294 n. 3 (holding that "the collateral source rule applies to Medicaid payments"); *Ellsworth*, 611 N.W.2d at 767 (applying the collateral source rule to medical expenses paid directly by Medicaid); *Cates*, 361 S.E.2d at 738 (explaining that Medicaid is "social legislation; it is the equivalent of health insurance for the needy" and "is an acceptable collateral source"); *Thoreson*, 201 N.W.2d at 752 (holding that the collateral source rule applies to Medicare, and "is not limited to paid-for benefits but applies to gratuitous medical services provided or paid for by the state"); *Brandon HMA, Inc.*, 809 So.2d at 619 (holding, by the Supreme Court of Mississippi, "that Medicaid payments are subject to the collateral source rule"); *see also* Restatement § 920A, comment c (explaining that "social legislation benefits" are subject to the collateral source rule).

Moreover, we agree with the statement of the Supreme Court of Ohio that receipt of such payments should not be admitted in evidence to reduce damages "[s]ince, by the collateral source rule, the receipt of collateral source benefits is deemed irrelevant and immaterial on the issue of damages[.]" *Pryor*, 263 N.E.2d at 239. The Ohio court reasoned that "[t]he entire theory of the collateral source rule is to keep the jury from learning anything about the collateral income so that it will not influence the decision of the jury" for the purpose of reducing the award of damages. *Id.* (quoting *Wolfe v. Whipple*, 112 Ill.App.2d 255, 251 N.E.2d 77, 82 (1970)).

Further, in regard to future public benefits, the Supreme Court of North Carolina opined persuasively that the collateral source rule should also preclude "defendants from offering evidence demonstrating that plain-

tiffs can mitigate their damages by using public resources" such as Medicaid. *Cates,* 361 S.E.2d at 738. In so holding, the court explained that the "goal of the law of damages is to place an injured party in as nearly the same position as he would have been had he not been injured." *Id.* In deciding that a plaintiff's future medical costs should not be limited to the rates charged by Medicaid, the Supreme Court of North Carolina reasoned that a contrary rule would detract from full recovery.

> Forced dependence on public charity because of injuries tortiously inflicted *puts the injured party in a position more disadvantageous* than if he were freed from his dependence. *Full compensation that frees the injured party from dependence on charity is more in keeping with the compensatory goal of tort recovery . . . .* The Plaintiff should be able to recover the cost of future medical services, since he is likely to prefer private care, and it is his "right" to have it. It may be that he will employ the free care for which he is eligible and thereby receive a "windfall," but . . . at the time of suit there is no way of knowing what he will choose to do.

*Id.* (emphases added) (citations omitted). Additionally, the court noted that "the collateral source rule should apply to possible future public benefits" because (1) "the lack of certainty characterizing the availability of public resources renders it unwise to allow mitigation of damages premised on their continued existence," and (2) the "utilization of many of these benefits hinges on a plaintiff's continued indigency." *Id.* at 738–39. Hence, on the grounds set forth herein, "the amounts billed in excess of the" Medicare/Medicaid "amount paid" are not irrelevant or inadmissible on the issue of medical special damages.

## XV.

Accordingly, for the reasons discussed herein, the answer to each of the district court's certified questions is, "No."

Dissenting Opinion by MOON, C.J., in Which LEVINSON, J., Joins.

I disagree with the majority's conclusion that a Medicare and/or Medicaid beneficiary may recover medical expenses that he or she, pursuant to federal law, was not legally obligated to pay. The majority's conclusion improperly, unnecessarily, and lightly disregards this jurisdiction's long standing formulation and treatment of special damages. I, therefore, respectfully dissent.

In its first certified question, the district court essentially asks whether the *amount paid* by Medicare and/or Medicaid—as opposed to the *amount charged* by a health care provider—should be awarded as medical expenses to a plaintiff in a negligence action. Because the amount paid is subsumed within the amount charged and none of the parties disagree that a plaintiff is entitled to recover the amount paid as medical expenses, the question becomes whether the *amount written-off* (*i.e.,* the amount charged less the amount paid) can be awarded as medical expenses to a plaintiff in a negligence action.

In actions arising in tort, three categories of damages are recoverable: (1) compensatory damages (including special and general damages); (2) punitive damages; and (3) nominal damages. *See Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 327, 47 P.3d 1222, 1240 (2002) (Acoba, J., concurring); *Kuhnert v. Allison,* 76 Hawai'i 39, 44, 868 P.2d 457, 462 (1994). Compensatory damages seek to (1) "compensate the injured party for the injury sustained, and nothing more[,]" *Kuhnert,* 76 Hawai'i at 44, 868 P.2d at 462 (citation and internal quotation marks omitted), and (2) restore [the plaintiff] to the position he [or she] would be in if the wrong had not been committed." *Gump v. Wal-Mart Stores, Inc.,* 93 Hawai'i 417, 423, 5 P.3d 407, 413 (2000) (quoting *Rodrigues v. State,* 52 Haw. 156, 167, 472 P.2d 509, 517 (1970)) (quotation marks omitted); *see also Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 389, 944 P.2d 1279, 1332 (1997). Punitive damages are "those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future." *Masaki v. Gen. Motors Corp.,* 71 Haw. 1, 6, 780 P.2d 566, 570, *reconsideration denied,* 71 Haw. 664, 833 P.2d 899

(1989); *see also Kang v. Harrington,* 59 Haw. 652, 660–61, 587 P.2d 285, 291 (1978). Nominal damages "are a small and trivial sum awarded for a technical injury due to a violation of some legal right and as a consequence of which some damages must be awarded to determine the right." *Van Poole v. Nippu Jiji Co.,* 34 Haw. 354, 360 (1937) (citation omitted).

Medical expenses, which are at the center of the instant dispute, are recoverable as compensatory *special damages*—not general damages. *Dunbar v. Thompson,* 79 Hawai'i 306, 315, 901 P.2d 1285, 1294 (App.1995). Special damages "compensate claimants for specific *out of pocket financial expenses and losses," Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 264, 842 P.2d 634, 647 (1992) (citation omitted) (emphasis added), *aff'd,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), and are "considered to be synonymous with *pecuniary loss* [,]" whereas general damages provide recovery for "such items as physical or mental pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms." *Dunbar,* 79 Hawai'i at 315, 901 P.2d at 1294 (citations omitted) (emphasis added); *see also Tabieros,* 85 Hawai'i at 389–90, 944 P.2d at 1332–33 ("compensatory damages include 'general damages, embracing items not subject to precise mathematical calculations, such as permanent injuries [and] pain and suffering' " (emphasis and citation omitted) (brackets in original)). As a form of *compensatory* special damages, medical expenses also: (1) compensate the plaintiff for the loss sustained, and nothing more; and (2) restore the plaintiff to the position he or she would be in if the wrong had not been committed. *See Gump,* 93 Hawai'i at 423, 5 P.3d at 413; *Tabieros,* 85 Hawai'i at 389, 944 P.2d at 1332; *Kuhnert,* 76 Hawai'i at 44, 868 P.2d at 462; *Norris,* 74 Haw. at 264, 842 P.2d at 647. Stated differently, a plaintiff's award of medical expenses is limited to the pecuniary loss he or she incurred. *See Nacino v. Koller,* 101 Hawai'i 466, 470–71 n. 10, 71 P.3d 417, 421–22 n. 10 (2003); *Yoshizaki v. Hilo Hosp.,* 50 Haw. 1, 16–17, 427 P.2d 845, 854, *reh'g granted,* 50 Haw. 40, 429 P.2d 829 (1967); *Masaki v. Columbia Cas. Co.,* 48 Haw. 136, 139–40, 395 P.2d 927, 929 (1964); *accord*

*Terrell v. Nanda,* 759 So.2d 1026, 1030–31 (La.Ct.App.2000) ("[a] plaintiff may ordinarily recover reasonable medical expenses ... which he [or she] incurs as a result of injury"); *Renne v. Moser,* 241 Neb. 623, 490 N.W.2d 193, 200 (1992) (noting that a plaintiff may recover "the reasonable value of medical expenses incurred as the result of the negligently caused injury"); *Moorhead v. Crozer Chester Med. Ctr.,* 564 Pa. 156, 765 A.2d 786, 789 (2001) (noting that a plaintiff may recover expenses that "have been actually paid[ ] or ... are reasonably necessary to be incurred"); *Haselden v. Davis,* 341 S.C. 486, 534 S.E.2d 295, 304 (2000) ("[i]t is a fundamental principle of the law of damages that a person who suffers personal injuries because of the negligence of another is entitled to recover the reasonable value of medical care and expenses incurred for the treatment of the injuries" (quotation marks and citation omitted)), *aff'd,* 353 S.C. 481, 579 S.E.2d 293 (2003). Thus, a plaintiff's recovery of medical expenses must be limited to the amount he or she has paid or became legally obligated to pay. *See* Black's Law Dictionary 771 (7th ed.1999) (defining "incur" as "[t]o suffer or bring on oneself (a liability or expense)"); *accord Terrell,* 759 So.2d at 1030–31 ("[t]he term 'incur' is defined as 'to become liable for' " (citation omitted)).

In the instant case, plaintiff-appellee Joseph Bynum (Joseph) was a beneficiary of Medicare and Medicaid. Pursuant to federal law, Joseph's health care providers were required to accept the amount paid by Medicare and Medicaid as payment in full. Thus, Joseph's providers wrote-off the remaining portion of his medical expenses. Because it is undisputed that *no one* paid this amount, the dispositive question is whether Joseph is *legally obligated* to pay that amount.

Medicare and Medicaid law prohibits participating health care providers from seeking reimbursement of the amount written-off from anyone, including the beneficiary, Medicare and/or Medicaid, or any other source. In other words, a beneficiary, whose medical expenses are paid by Medicare and/or Medicaid, does not incur the amount written-off by the health care provider. *Accord Terrell,* 759 So.2d at 1029–31. Consequently, the

beneficiary never becomes legally obligated to pay the amount written-off. Similarly, in this case, because Joseph did not incur the amount written-off by his health care providers, he is not legally obligated to pay it. Thus, if Joseph recovers only the amount he incurred—namely, the amount paid on his behalf by Medicare and Medicaid, which he is legally obligated to reimburse to Medicare and Medicaid under federal law,—he will be fully compensated with regard to his medical expenses.

The majority's conclusion that Joseph may recover more than the amount he is legally obligated to pay contravenes Hawai‘i's compensatory special damages law by restoring him to a position *better* than he would have been had the wrong not been committed—*i.e.*, Joseph will be *over* compensated. *See Gump*, 93 Hawai‘i at 423–24, 5 P.3d at 413–14. The majority, by its ruling today, permits the recovery of unincurred medical expenses which this jurisdiction's precedent clearly prohibits.

"As a general rule, we do not lightly disregard precedent; we subscribe to the view that great consideration should always be accorded precedent, especially one of long standing and general acceptance." *State v. Jenkins*, 93 Hawai‘i 87, 111–12, 997 P.2d 13, 37–38 (2000) (citation omitted); *see also State v. Harada*, 98 Hawai‘i 18, 23 n. 3, 41 P.3d 174, 179 n. 3 (2002). "[We] should 'not depart from the doctrine of stare decisis without *some compelling justification.*'" *State v. Garcia*, 96 Hawai‘i 200, 206, 29 P.3d 919, 925 (2001) (citing *Hilton v. South Carolina Pub. Ry. Comm'n*, 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991); *Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai‘i 398, 421, 992 P.2d 93, 116 (2000)) (emphasis in original). Furthermore, "[we] should not overrule [our] earlier decisions unless the most cogent reasons and inescapable logic require it." *Dairy Rd. Partners*, 92 Hawai‘i at 421, 992 P.2d at 116 (citation and quotation marks omitted). And, "we should not change a case law just for the sake of a change." *McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 180, 504 P.2d 1330, 1335 (1973); *Robinson v. Ariyoshi*, 65 Haw. 641, 653 n. 10, 658 P.2d 287, 297 n. 10 (1982), *reconsideration denied*, 66 Haw. 528, 726 P.2d 1133 (1983). Nevertheless, this court has previously disregarded precedent in cases where some compelling justification, cogent reason, and/or inescapable logic required doing so. *See, e.g., Kahale v. City & County of Honolulu*, 104 Hawai‘i 341, 347 n. 7, 90 P.3d 233, 239 n. 7 (2004), *overruling Salavea v. City & County of Honolulu*, 55 Haw. 216, 220–21, 517 P.2d 51, 54–55 (1973) ("The 'compelling justification' for our abrogation of the *Salavea* rule is that its reasoning is analytically bankrupt."); *State v. Ah Loo*, 94 Hawai‘i 207, 211, 10 P.3d 728, 732, *reconsideration denied*, 94 Hawai‘i 207, 10 P.3d 728, (2000), *overruling State v. Blackshire*, 10 Haw.App. 123, 135, 861 P.2d 736, 742 (1993) (overruling *Blackshire* because it "wrongly decided" that, "as a *per se* matter, a person is 'in custody' the moment he or she has been 'seized[ ]' "); *Dairy Rd. Partners*, 92 Hawai‘i at 421–22, 992 P.2d at 116–17, *overruling Hawaiian Ins. & Guar. Co. v. Blanco*, 72 Haw. 9, 17, 804 P.2d 876, 880 (1990) and *Hawaiian Ins. & Guar. Co. v. Brooks*, 67 Haw. 285, 289, 686 P.2d 23, 26 (1984) ("we are inescapably led to the conclusion that, by misapplying our own holding in *Standard Oil*, [65 Haw. 521, 654 P.2d 1345 (1982)], this court took a wrong turn in *Blanco* and, at least by implication, in *Brooks* [; i]n order to restore manifest justice . . . we therefore overrule *Brooks* and *Blanco*"); *Francis v. Lee Enters., Inc.*, 89 Hawai‘i 234, 239, 971 P.2d 707, 712 (1999), *overruling Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972) ("we decline to recognize the [*Dold–Chung* [*v. Kaonohi Center Co.*, 62 Haw. 594, 618 P.2d 283 (1980)]] rule any longer . . . [because] we believe that: (1) the *Dold–Chung* rule does not accord with certain basic principles relevant to contract law; and (2) 'unintended injury would result[ ]'" (citation omitted)).

Although the certified question is one of first impression as noted by the majority, we arrive at an answer to that question by examining our case law. Thus, great consideration must be accorded to this jurisdiction's long standing damages law. *See Jenkins*, 93 Hawai‘i at 111–12, 997 P.2d at 38; *Harada*, 98 Hawai‘i at 23 n.3, 41 P.3d at 179 n. 3. By disregarding this jurisdiction's precedent, the majority effectively creates a new category of

damages. An award of the written-off amount does not fall within the permissible categories of compensatory, punitive, or nominal damages. First, the amount written-off is not recoverable as compensatory special damages for the reasons previously discussed. Because an award of the amount written-off does not provide remuneration for "physical or mental pain and suffering, inconvenience, and loss of enjoyment[,]" it is not recoverable as compensatory general damages. *Dunbar*, 79 Hawai'i at 315, 901 P.2d at 1294. Second, although punitive damages may be awarded in negligence actions upon a showing that "the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations[,]" *Masaki*, 71 Haw. at 11, 780 P.2d at 572 (citation and quotation marks omitted), medical expenses clearly cannot be said to be punitive in nature. Third, by the same token, because the amount written-off "exceed[s] one million dollars[,]" it cannot be said to be nominal. *See Minatoya v. Mousel*, 2 Haw.App. 1, 6, 625 P.2d 378, 382 (1981) ("nominal damages may not exceed $1.00[ ]"). Accordingly, inasmuch as the majority's holding allows the recovery of an amount which does not fall within one of the permissible categories of damages, the majority's decision contravenes this jurisdiction's precedent by creating a new category of damages without justification.

Not only does the majority turn a blind eye to Hawai'i's damages law, but it also fails to address the policy considerations justifying its departure therefrom. Although the majority asserts that such considerations are inherent in authorities to which it cites and its discussion, the majority points only to policies relating to its application of the collateral source rule; it does not discuss policies justifying its deviation from this jurisdiction's precedent. Accordingly, inasmuch as the majority fails to address these policy concerns, provides no "compelling justification" or "cogent reason" for sidestepping our long standing damages law, and, instead, relies on the Restatement (Second) of Torts to reach the desired result, I believe that the majority improperly, unnecessarily, and "lightly disregard[s our] precedent."

The majority also erroneously relies on arguments advanced in the American Association of Retired Person's (AARP) amicus curiae brief for its proposition that allowing Medicare and/or Medicaid beneficiaries to recover the amount written-off "leads to a more just result." For example, the majority states that, according to the AARP, permitting recovery of the amount written-off " 'ensure[s] that low-income elderly and disabled individuals are *treated equitably vis a vis privately insured individuals* by compensating for aspects of the [Medicare/Medicaid] programs that would *substantially limit, if not completely eliminate, the beneficiary's recovery of special damages.*' " (Emphases added). Put differently, the AARP and the majority essentially reason that a Medicare and/or Medicaid beneficiary should recover the same amount of medical expenses as any other individual, irrespective of whether the other individual receives public medical insurance, pays for private medical insurance, or is uninsured. This assertion is plainly wrong. We have stated that "special damages do not arise solely from the wrongful act itself, but rather *depend on the circumstances peculiar to the infliction of each particular injury.*" *Ellis v. Crockett*, 51 Haw. 45, 50, 451 P.2d 814, 819 (citation omitted) (emphasis added), (*reh'g denied*, 51 Haw. 86, 451 P.2d 814 (1969)). Thus, the amount of medical expenses recoverable *in this case* is *not* determined by the medical expenses that health care providers may charge and recover from *someone else* (for example, a privately insured or uninsured individual), but the "out of pocket" expenses incurred for the reasonably necessary medical treatment rendered to *this plaintiff, i.e.*, Joseph. Otherwise, if awards for medical expenses are increased or decreased based on what *another individual* may have incurred, overcompensation or undercompensation may result.

Moreover, the AARP's position that, if a beneficiary is not allowed to recover the amount written-off, his or her recovery of medical expenses will be "substantially limit[ed], if not completely eliminate[d]," is also incorrect. Based on this jurisdiction's formulation and treatment of special damages as discussed above, a beneficiary will receive the *full* award of special damages to which he

or she is entitled if the beneficiary recovers only the incurred expenses.[1] Consequently, he or she will not be penalized as suggested by the majority.

Additionally, awarding a Medicare and/or Medicaid beneficiary only medical expenses that were incurred will not result in a windfall to the tortfeasor. In fact, limiting the award to the amount incurred ensures that *neither party* will receive a windfall. Tortfeasors would be held fully liable for their actions, and the beneficiary would be made whole. However, if, as the majority holds, a beneficiary is allowed to recover medical expenses that no one incurred, *the beneficiary* would recover a windfall at the expense of taxpayers. *See Bozeman v. State,* 879 So.2d 692, 705, *reh'g denied,* (La.2004) ("it would be unconscionable to permit the taxpayers to bear the expense of providing free medical care to a person and then allow that person to recover damages for [unincurred] medical expenses from a tort-feasor and pocket the windfall[ ]" (citation and quotation marks omitted)); *Terrell,* 759 So.2d at 1031; *Moorhead,* 765 A.2d at 789.

The majority cites to *Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n,* 89 Hawai'i 269, 971 P.2d 1104 (1999), for the proposition that the collateral source rule applies in this case "inasmuch as the wrongdoer should not profit from third party benefits." Majority at 89, 101 P.3d at 1157 n. 16. In *Sam Teague, Ltd.,* this court was faced with determining whether a back pay award in an employment discrimination case may be reduced by the amount of unemployment benefits received by the plaintiff-employee during the period which the defendant-employer refused to employ her. 89 Hawai'i at 281, 971 P.2d at 1116. Therein, this court's application of the collateral source rule turned on the "general functions" of back pay awards, one of which is "to deter future discrimination." *Id.* (citation omitted). In that regard, this court noted that, if the plaintiff's back pay award was reduced by the amount of unemployment

benefits she received, it would be "less costly for the employer to wrongfully terminate a protected employee and thus dilutes the prophylactic purposes of a back pay award[.]" *Id.* at 282, 971 P.2d at 1117 (citation omitted). This court also stated that such an outcome would "result[ ] in a windfall to the employer who committed the illegal discrimination" and that, "[a]lthough collateral source payments represent additional benefits to [the plaintiff], as between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer." *Id.* (citations and quotation marks omitted). Thus, this court applied the collateral source rule to the unemployment benefits paid to the plaintiff.

In contrast to *Sam Teague, Ltd.,* the alleged benefit received by Joseph—*i.e.,* the amount written off by his health care providers—does not serve to deter future conduct. Thus, recovery of only the amount paid cannot be said to "dilute[ ] the prophylactic purposes of" an award for medical expenses. *See id.* (citation omitted). Moreover, inasmuch as the instant case concerns the recovery of medical expenses, which are awarded for *compensable* losses, it is irrelevant whether Joseph "may have experienced other noncompensable losses[.]" Additionally, the court in *Sam Teague, Ltd.* applied the collateral source rule to *payments*—not write offs—made by a collateral source. *Id.* at 281–83, 971 P.2d at 1116–18. Thus, this court's decision in *Sam Teague, Ltd.* is inapposite to the certified question before us.

In conclusion, I believe that the questions presented to this court can be answered by applying the existing precedent in this jurisdiction regarding Hawai'i's special damages law. The majority offers no compelling justification or cogent reason to disregard our precedent and resort to the Restatement's discussion of the collateral source rule to overcompensate Medicare and/or Medicaid

---

1. Of course, a beneficiary's recovery is not limited to his or her award of medical expenses. He or she may also recover (1) other special damages, such as "loss of earnings[ ] and diminished capacity to work[,]" *Dunbar,* 79 Hawai'i at 315, 901 P.2d at 1294 (citation omitted); (2) general damages for "physical or mental pain and suffering, inconvenience, and loss of enjoyment[,]" *id.* (citation omitted); and (3) punitive damages if the tortfeasor acted wantonly, oppressively, or with malice, *Masaki,* 71 Haw. at 11, 780 P.2d at 572.

beneficiaries. Based on the foregoing, I would conclude that, when a health care provider writes off a portion of a Medicare and/or Medicaid beneficiary's medical expenses, the beneficiary does not incur any liability for such amount and would, therefore, hold that the beneficiary's recovery of the reasonable value of medical services does not include the written-off amount as compensatory special damages. Accordingly, I would answer both questions certified by the federal district court in the affirmative.